917 P.2d 1382

**Joan GARRITY, Dawn Garrity Wood, and Troy Garrity, Plaintiffs–Appellants,**

v.

**OVERLAND SHEEPSKIN COMPANY OF TAOS, a New Mexico corporation, Overland Outfitters, Inc., an Iowa corporation, Overland Sheepskin, a New Mexico corporation, and James Leahy, Defendants–Appellees.**

No. 22181.

Supreme Court of New Mexico.

May 29, 1996.

Aarons Law Firm, P.C., Stephen D. Aarons, Santa Fe, for Appellants.

Herrera, Long & Pound, P.A., John B. Pound, Santa Fe, for Appellees.

## OPINION

FROST, Chief Justice.

1. This appeal involves what are essentially two separate claims arising out of a similar employment background. The first claim is by Joan Garrity and her daughter Dawn Garrity Wood (the Garritys) against Overland Outfitters, Inc. (Overland Outfitters), for wrongful discharge and breach of contract. The second claim is a personal injury suit brought by Joan Garrity's son Troy Garrity (Troy) against Overland Sheepskin Company of Taos, Inc. (Overland Sheepskin). We will address both these claims in turn.

## I. FACTS

2. Overland Sheepskin is a corporation owned by James and Leslie Leahy that con-

trols and operates a chain of retail stores selling sheepskin coats, animal pelts, clothing, and various other leather and fur products. Joan, Dawn, and Troy all worked as sales staff in Overland Sheepskin's Santa Fe store. On February 28, 1991, Overland Sheepskin sold its Santa Fe store to Overland Outfitters, a national retail organization. Overland Outfitters continued to operate the Santa Fe store in the same manner as Overland Sheepskin had done. As part of the sales agreement, James Leahy, who owned the building that houses the Santa Fe store, agreed to lease the property to Overland Outfitters.

## A. The Garritys' Claim

3. Shortly after Overland Outfitters purchased the Santa Fe store in February 1991, it brought in Bruce Davis as the new store manager. Davis retained the Garritys as sales staff for Overland Outfitters and raised their pay. The Garritys allege that they noticed Davis exhibiting unusual behavior shortly after he began working at the Santa Fe store. They allege that he would frequently retire to a room in the back of the store, which he used as his apartment, and when he emerged he acted aggressively and erratically. They also allege that, on one occasion, Troy's friend looked through a partially opened office door and observed Davis sniffing a white powdery substance. Shortly following this incident, Joan Garrity phoned Leslie Leahy, who was acting as the Santa Fe contact for Overland Outfitters, and reported her suspicions that Davis was using illegal drugs. Leslie Leahy agreed to notify the owner of Overland Outfitters. One week later, on April 4, 1991, Davis fired the Garritys. The Garritys then sued for breach of employment contract and wrongful discharge.[1] After the Garritys presented their case in chief, the trial court granted Overland Outfitters' motion for a directed verdict.

## B. Troy's Claim

4. Troy alleges that, after the February sale of the Santa Fe store to Overland Outfitters, James Leahy continued to ship truckloads of exotic animal pelts from Overland Sheepskin's warehouse in Taos to the Santa Fe store. Troy was responsible for loading, unloading, and inventorying many of these shipments. Troy states that one of these shipments included a decomposing bear pelt, which he was instructed to return to Taos.

5. Troy contends that on approximately March 18, 1991, he contracted a debilitating illness. In April 1991 Overland Outfitters fired Troy. About one year later, Troy learned from an infectious disease specialist that he had likely contracted chronic brucellosis. Brucellosis is a rare, incurable, bacterial disease endemic among wild animals and domesticated sheep. The disease is not contagious between humans, but humans can contract the disease from direct exposure to the blood or tissue of infected animals. The specialist indicated that Troy had probably contracted the disease from handling the animal pelts.

6. Troy filed a complaint with the Workers' Compensation Division against Overland Outfitters, his employer at the time he alleged that he contracted the disease. Troy settled his workers' compensation claim against Overland Outfitters for $50,000. As part of the settlement, the parties executed a release that applied directly to Overland Outfitters, but also included Overland Sheepskin, Troy's former employer, as a predecessor in interest of Overland Outfitters. Troy then sued Overland Sheepskin as supplier and consignor of the suspectedly diseased pelts and James Leahy in his role of landlord of the premises. The trial court granted summary judgment in favor of Overland Sheepskin, holding that Troy released his claim

1. Troy Garrity and both Joan Garrity and Dawn Garrity Wood filed their claims jointly against Overland Outfitters, Overland Sheepskin, and James Leahy even though Troy and the Garritys were proceeding under different theories of re-

covery. The trial court severed Troy's suit against Overland Sheepskin and James Leahy from the Garritys' trial against Overland Outfitters.

against Overland Sheepskin when he released Overland Outfitters.[2]

7. The Garritys and Troy appeal from the trial court's judgments. We affirm the trial court as to the Garritys' claims and reverse and remand as to Troy's personal injury claim.

## II. THE GARRITYS' WRONGFUL DISCHARGE CLAIMS

■ 8. The trial court granted Overland Outfitters' motion for directed verdict against the Garritys on their claims for breach of employment contract and retaliatory discharge. On appeal from a grant or denial of a motion for a directed verdict, we view the facts and all reasonable inferences in the light most favorable to the party resisting the motion. *Gonzales v. Surgidev Corp.*, 120 N.M. 133, 145, 899 P.2d 576, 588 (1995); *Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 437, 872 P.2d 852, 858 (1994).

### A. The Garritys' Employment Contract Claim

■ 9. The Garritys first argue that they were fired in violation of an oral employment contract. · This argument is without merit. Neither Joan Garrity nor Dawn Garrity Wood testified that Davis or Overland Outfitters ever offered the Garritys an employment contract. The Garritys' also did not allege at trial that Davis or Overland Outfitters even made any promises to them that they could be fired only for just cause. Dawn Garrity Wood did testify that she had a general feeling that if she did good work, she would always have a job at Overland Outfitters.

■ 10. However, a vague impression or general feeling of continued employment is not sufficient to create an employment contract.

The general rule in New Mexico is that an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise.

*Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 668, 857 P.2d 776, 779 (1993), *cert. denied*, 510 U.S. 1118, 114 S.Ct. 1068, 127 L.Ed.2d 387 (1994). Courts have allowed an exception to the at-will employment rule when there is an implied contract arising out of an employer's promise not to fire an employee except for just cause. *Id.* However, we will not find an implied contract for cases in which "the alleged promise by the employer [is] not sufficiently explicit." *Id.* at 669, 857 P.2d at 780.

■ 11. To bolster their claim, the Garritys point out that Overland Outfitters had a written personnel policy which they argue created an implied contract. However, Overland Outfitters first published this personnel policy in August 1991, four months after Overland Outfitters fired the Garritys. The Garritys, however, rely on a statement made by Davis in his deposition. After being asked whether he may have communicated the terms of the personnel policy to the Garritys in March 1991, Davis replied: "I don't recall having done that. It's not unlikely that I did mention [it]." This statement, upon which the Garritys place much significance, is equivocal at best. However, even if we assume that this statement could give rise to the inference that Davis promised to abide by the terms of the written personnel policy, we conclude that this policy did not create an implied employment contract.

12. The written personnel policy of August 1991 expressly provided that Overland Outfitters "reserve[d] the right to terminate any employee without notice for any reason (as long as such termination is not in violation of law)." As we explained in *Hartbarger*: "An implied contract is created only where an employer creates a reasonable ex-

---

2. The court denied Leahy's summary judgment motion. For reasons of judicial economy, Troy has delayed proceeding with his claim against Leahy as landlord pending the resolution of this appeal.

pectation. The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." *Id.* at 672, 857 P.2d at 783. Given the express reservation of the right to terminate an employee for any reason, Overland Outfitters' written personnel policy cannot be said to have created any reasonable expectation of an implied contract. *See id.* at 672–75, 857 P.2d at 783–86 (rejecting implied contract claim under similar circumstances). Accordingly, we conclude that the Garritys were at-will employees without an employment contract either express or implied.

## B. The Garritys' Retaliatory–Discharge Claim

■ 13. The Garritys next argue that, even if they did not have an employment contract, they still were improperly terminated. They allege that Overland Outfitters fired them for reporting the illegal activities of the store manager, which firing, they argue, violates public policy and gives rise to a tort claim for retaliatory discharge.

14. New Mexico first recognized the tort of retaliatory discharge in *Vigil v. Arzola,* 102 N.M. 682, 686–90, 699 P.2d 613, 617–21 (Ct.App.1983), *rev'd in part on other grounds,* 101 N.M. 687, 687 P.2d 1038 (1984), *overruled in part on other grounds by Chavez v. Manville Prods. Corp.,* 108 N.M. 643, 649, 777 P.2d 371, 377 (1989). In *Vigil,* the Court of Appeals noted that, traditionally, employers could fire at-will employees for good cause, no cause, or even for reasons that were morally suspect. *Id.* at 686, 699 P.2d at 617. However, this strict policy created harsh results that were sometimes contrary to the general public welfare. Consequently, the *Vigil* Court joined a growing number of jurisdictions that recognize a public-policy exception to the traditional at-will employee discharge rule. *Id.* at 688, 699 P.2d at 619.

15. The Court explained in *Vigil* that, for employees to recover under a retaliatory-discharge claim, they must demonstrate that they were discharged because they performed acts that public policy has authorized or would encourage, or because they refused to do something required by an employer that public policy would condemn. *Id.* at 689, 699 P.2d at 620. The employees must show a causal connection between their actions and their subsequent discharge. *Id.; see also Shovelin v. Central N.M. Elec. Coop.,* 115 N.M. 293, 303, 850 P.2d 996, 1006 (1993). In addition, in cases involving discharge for reporting illegal activity, or "whistleblowing," employees must show that their actions furthered a public interest rather than a private one. *Gutierrez v. Sundancer Indian Jewelry, Inc.,* 117 N.M. 41, 48, 868 P.2d 1266, 1273 (Ct.App.1993) (quoting *Wagner v. City of Globe,* 150 Ariz. 82, 89, 722 P.2d 250, 257 (1986) (en banc)), *cert. denied,* 117 N.M. 121, 869 P.2d 820 (1994).

### 1. Public Policy Requirement

16. In *Shovelin,* this Court explained, "The linchpin of a cause of action for retaliatory discharge is whether by discharging the complaining employee the employer violated a 'clear mandate of public policy.'" *Shovelin,* 115 N.M. at 303, 850 P.2d at 1006 (quoting *Vigil,* 102 N.M. at 688, 699 P.2d at 619). We also described several sources of public policy that could serve as the basis for a claim of retaliatory discharge, including legislation that defines a public policy without necessarily specifying either a right or a remedy for an employee. *Id.*

17. In the present case, the public policy at issue is the reporting of suspected illegal activities, namely, the use of illegal drugs. Although our legislature has not provided any specific rights or remedies for employees who discover or suspect that a coworker or supervisor is committing a crime, it has clearly enunciated a strong public policy against condoning criminal activity and in favor of uncovering and eradicating it. As the Illinois Supreme Court stated:

There is no public policy more basic, nothing more implicit in the concept of ordered liberty than the enforcement of a State's

criminal code. There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens.

No specific constitutional or statutory provision requires a citizen to take an active part in the ferreting out and prosecution of crime, but public policy nevertheless favors citizen crime-fighters. "Public policy favors the exposure of crime, and the cooperation of citizens possessing knowledge thereof is essential to effective implementation of that policy. Persons acting in good faith who have probable cause to believe crimes have been committed should not be deterred from reporting them . . . ."

*Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 16–17, 421 N.E.2d 876, 879–80 (1981) (citations omitted) (holding that firing of employee who had reported suspected illegal activity of coworker to police and had agreed to assist in police investigation violated a clear mandate of public policy and gave rise to claim of retaliatory discharge) (quoting *Joiner v. Benton Community Bank*, 82 Ill.2d 40, 44 Ill.Dec. 260, 262, 411 N.E.2d 229, 231 (1980)). *Cf. Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385, 388–89 (1980) (holding that reporting violations of state food-labelling laws was important public-policy concern that supported action for retaliatory discharge); *Harless v. First Nat'l Bank*, 162 W.Va. 116, 246 S.E.2d 270, 275–76 (1978) (holding that firing employee for reporting violations of consumer credit protection laws implicated strong public-policy concerns sufficient to support claim for retaliatory discharge). Accordingly, we conclude that the Garritys have alleged an interest for which there is a clear mandate of public policy.

### 2. Public Benefit Requirement

■ 18. A finding that clear public-policy considerations are implicated is only the first step, however, in evaluating whether the employee is entitled to pursue a retaliatory-discharge claim. When an employee is discharged for whistleblowing, the employee must also demonstrate that his or her actions furthered the public interest rather than served primarily a private interest. As the Court of Appeals explained in *Gutierrez:* "We believe that whistleblowing activity which serves a public purpose should be protected. So long as employees' actions are not merely private or proprietary, but instead seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged." *Gutierrez,* 117 N.M. at 48, 868 P.2d at 1273 (quoting *Wagner,* at 89, 722 P.2d at 257). *See generally* Henry H. Perritt. Jr., *Employee Dismissal Law and Practice* §§ 5.1, 5.17 (2d ed. 1987 & Supp. 1989) (explaining that, to establish prima facie case, employee must show that discharge actually placed asserted public-policy interest in jeopardy under the facts of the case).

19. The California Supreme Court clearly laid out this public-benefit requirement, stating, "Even [when] a statutory touchstone has been asserted, we must still inquire whether the discharge is against public policy and affects a duty which inures to the benefit of the public at large rather than to a particular employer or employee." *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 217, 765 P.2d 373, 379 (1988) (in bank). In *Foley* the employee was fired for reporting to company management that the FBI was investigating his supervisor for embezzling from a previous employer. *Id.* The court explained:

Whether or not there is a statutory duty requiring an employee to report information relevant to his employer's interest, we do not find a substantial public policy prohibiting an employer from discharging an employee for performing that duty. Past decisions recognizing a tort action for discharge in violation of public policy seek to protect the public, by protecting the employee who refuses to commit a crime, who reports criminal activity to proper authorities, or who discloses other illegal, unethical, or unsafe practices. No equivalent public interest bars the discharge of the present plaintiff. When the duty of an employee to disclose information to his

employer serves only the private interest of the employer, the rationale underlying [a wrongful discharge] cause of action is not implicated.

*Id.* at 218, 254 Cal.Rptr. at 380 (citations omitted) (footnotes omitted).

20. Although the information reported by the employee in *Foley* concerned only prior criminal activity, subsequent cases have held that this distinction between serving a private interest rather than the public interest applies equally to reports of ongoing criminal activities. In *American Computer Corp. v. Superior Court,* an employee was fired for reporting to superiors suspected embezzlement by a coworker. *American Computer Corp. v. Superior Court,* 213 Cal.App.3d 664, 261 Cal.Rptr. 796, 797 (Ct.App.), *review denied,* (Nov. 16, 1989). The California Court of Appeal concluded that the internal reporting of suspected embezzlement of company funds primarily benefitted the private interest of the employer and only remotely protected the public interest. *Id.* at 798–99; *see also Jeffers v. Butler,* 762 F.Supp. 308, 310 (D.N.M.1990) (interpreting New Mexico law as denying retaliatory-discharge claim when employee's action benefits private rather than public interest (quoting *Foley,* 765 P.2d at 379)), *aff'd,* 931 F.2d 62, 1991 WL 59365 (10th Cir.1991).

21. The Garritys argue that any internal report of another's illegal activity should be sufficient to satisfy the public interest requirement, without any additional showing of actual public benefit. However, such an open-ended rule would broaden the public-policy exception to the at-will doctrine beyond its limited purpose. As we explained in *Shovelin,* "the courts interpreting New Mexico law have adhered to the rule that retaliatory discharge is a narrow exception to the rule of employment at will and have refused to expand its application." *Shovelin,* 115 N.M. at 304, 850 P.2d at 1007.

22. Overland Outfitters argues, on the other hand, that an employee's internal reporting of illegal activity to his or her employer is never in the public interest. Over-

land Outfitters contends that the only way an employee can benefit the public interest is if the employee reports the illegal activity to a governmental agency. For support, Overland Outfitters relies on *Gutierrez,* in which the Court of Appeals stated that "allowing an employer to retaliate against an employee for reporting unsafe working conditions *to appropriate public officials* is contrary to public policy in New Mexico and gives rise to a common-law remedy." *Gutierrez,* 117 N.M. at 47, 868 P.2d at 1272 (emphasis added). Overland Outfitters therefore contends that, because the Garritys reported their suspicions to their employer rather than the police, their retaliatory-discharge claim must fail. However, this is too limited a reading of *Gutierrez* and of the law of retaliatory discharge.

23. In *Gutierrez,* the Court considered the claim of an employee discharged for reporting unsafe working conditions to the appropriate public agency. The Court properly concluded that such whistleblowing to a public agency furthers the public interest in a safe workplace and would serve as the basis for a retaliatory-discharge suit. *Id.* The *Gutierrez* Court, however, did not address the case of an employee reporting information only to his or her supervisor; and the above quoted language should not be read as foreclosing the possibility of bringing a retaliatory-discharge claim in such circumstances.

■ 24. More relevant to our analysis is the *Gutierrez* Court's statement noting, "Whether an employee has stated a sufficient policy to recover for the tort of wrongful discharge is determined on a case-by-case basis." *Id.* As the Court explained:

[T]here is a tension between the obvious societal benefits in having employees with access to information expose activities which may be illegal or which may jeopardize health and safety, and accepted concepts of employee loyalty; nevertheless we conclude that on balance *actions which enhance the enforcement of our laws or expose unsafe conditions, or otherwise serve some singularly public purpose,* will inure to the benefit of the public.

*Id.* at 48, 868 P.2d at 1273 (emphasis added) (quoting *Wagner*, 722 P.2d at 257). Accordingly, when evaluating a retaliatory-discharge claim in which an employee has asserted a clear mandate of public policy but did not alert the appropriate public officials, the courts must determine on a case-by-case basis whether the employee's actions furthered some singularly public purpose or served primarily to benefit the private interest of the employer or employee.

25. Turning to the present case, we conclude that the Garritys' actions served primarily to benefit their employer and themselves rather than the public at large. Both of the Garritys testified at length regarding the difficulties they had in working under Davis because of his erratic and aggressive behavior. Joan Garrity testified that on one occasion she even suspected that Davis was intentionally trying to set Dawn up and get her in trouble with the store owners. The Garritys were also concerned about Davis's temperament and his managerial skills. The Garritys' report about Davis was designed to help their employer correct what they perceived to be a potentially troublesome situation in the workplace as well as to improve their own work environment.

26. The Garritys have not demonstrated that by reporting their suspicions to their employer they would have furthered the public policy of preventing crimes or protecting the general public from the social evils associated with illegal drug use. There was no indication that Davis's behavior posed any real or direct threat of harm to the public nor that the Garritys were acting to protect the general public.

■ 27. We note that this case does not involve an employee in a profession for which drug use would pose an immediate, identifiable risk to the public. *Cf. Semore v. Pool,* 217 Cal.App.3d 1087, 266 Cal.Rptr. 280, 286–88 (Ct.App.) (noting in wrongful-discharge case that public-safety interest may outweigh employee's privacy right to be free from random drug tests when employee works in dangerous or sensitive position, such as in chemical manufacturing plant), *review denied,* (May 31, 1990); *Luck v. Southern Pac. Transp. Co.,* 218 Cal.App.3d 1, 267 Cal.Rptr. 618, 630–32 (Ct.App.) (holding that, although railroad operation generally involves safety considerations, employee's role as computer technician unconnected with train operation did not implicate safety interests, and therefore drug testing was unwarranted), *review denied,* (May 31, 1990), *cert. denied,* 498 U.S. 939, 111 S.Ct. 344, 112 L.Ed.2d 309 (1990). Nor does this case involve an economic crime that directly injures the general public and that an employer can remedy immediately if made aware of the problem. *See, e.g., Collier v. Superior Court,* 228 Cal.App.3d 1117, 279 Cal.Rptr. 453, 455–56 (Ct.App.) (noting that internal report of criminal activity that involved alleged unfair pricing, antitrust violation, and tax fraud implicated substantial public interest rather than just economic loss to employer and properly served as basis for retaliatory-discharge claim), *review denied,* (June 27, 1991); *Vigil,* 102 N.M. at 690, 699 P.2d at 620 (noting internal report of misuse of public money may serve as basis for retaliatory-discharge claim). The mere fact that the Santa Fe store was a retail establishment in which members of the public possibly could have come into contact with Davis while he was allegedly on drugs, is not sufficient to transform the nature of the Garritys' internal report from an action primarily designed to further their employer's private interests as well as to improve their own work environment into an action taken for the benefit of the public good. Accordingly, we affirm the trial court's grant of a directed verdict against the Garritys on their retaliatory-discharge claim.

### III. TROY'S TORT CLAIM AGAINST OVERLAND SHEEPSKIN

28. Troy raises an entirely different issue in his appeal than those raised by his mother and sister. Troy contends that the trial court erred in granting summary judgment on his personal injury claim against Overland Sheepskin in its capacity as supplier of pelts allegedly infected with the brucella bacteria.

718

**29.** " 'Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.' If the facts are undisputed and only a legal interpretation of the facts remains, summary judgment is the appropriate remedy." *Board of County Comm'rs v. Risk Management Div.,* 120 N.M. 178, 179, 899 P.2d 1132, 1133 (1995) (quoting *Koenig v. Perez,* 104 N.M. 664, 665, 726 P.2d 341, 342 (1986)) (citation omitted).

### A. The Release and Settlement Agreement Did Not Release Overland Sheepskin in Its Capacity as Supplier and Consignor of Pelts

**30.** The trial court granted summary judgment for Overland Sheepskin based on Troy's "Complete Release and Settlement Agreement," in which Troy released Overland Outfitters from any workers' compensation claim. The trial court concluded that Overland Sheepskin was Troy's employer prior to the sale of the store to Overland Outfitters and that the Overland Outfitters release also released all of Overland Outfitters' predecessors in interest including Troy's previous employers. Troy argues that the intent of the parties was only to release Overland Sheepskin in its capacity as Troy's former employer, and not in its capacity as a subsequent supplier of allegedly contaminated pelts. Overland Sheepskin counters that the terms of the release are facially unambiguous and serve to release Overland Sheepskin from all claims against it, either in its role as employer or as supplier and consignor of pelts.

**31.** We agree with the trial court that the release is not ambiguous. However, we disagree with the court's conclusion that, by releasing Overland Sheepskin in its role as former employer, the parties also intended to release Overland Sheepskin from all non-employment-based claims as well. We conclude as a matter of law that the agreement only released Overland Sheepskin in its capacity as former employer and not in its capacity as supplier and consignor of allegedly infected pelts. *See C.R. Anthony Co. v.*

*Loretto Mall Partners,* 112 N.M. 504, 510, 817 P.2d 238, 244 (1991) (noting that when proper interpretation of terms is sufficiently clear that no reasonable person would determine the issue in any way but one, it may properly be decided as a matter of law).

**32.** Troy's release provided in relevant part:

> In consideration of the lump sum payment referred to in Paragraph IV, ... Troy Garrity ... hereby releases and forever discharges Overland Outfitters, Inc. and USF & G ... and predecessors or successors of interest to Overland Outfitters of [sic] USF & G *in their respective capacities as predecessors or successors of interest,* of and from any and all claims, ... including but not limited to any common law claim, statutory liability claim, Occupational Disease Disablement Act claim, Workers' Compensation Act claim, vocational rehabilitation claim, costs and attorney fees, or any other claims ... on account of, arising out of, or any way related to the Occurrence ... as more specifically set forth in the pleadings filed by Troy Garrity in the Workers' Compensation Division, Cause No. 92–05066; *the scope of this release includes the release of Overland Sheepskin Co., the predecessor in interest of Overland Outfitters, Inc., from any and all Occupational Disease Disablement Act Claims and/or Workers' Compensation Act claims.*

(Emphasis added).

**33.** We note that the agreement does specifically release Overland Outfitters' predecessors in interest, which included Overland Sheepskin. However, it only releases the predecessors in interest "in their respective capacities" as predecessors in interest. Accordingly, this agreement is properly read as only releasing Overland Sheepskin from any claim that could be brought against it in its capacity as Troy's former employer. Troy's personal injury claim, however, is premised on Overland Sheepskin acting not as his employer but as a supplier and consignor of allegedly infected pelts, with which Troy

claims he came into contact after Overland Sheepskin had sold the Santa Fe store to Overland Outfitters and was no longer Troy's employer. Accordingly, under this language, Troy only released Overland Sheepskin for any claims relating to his illness which arose before February 28, 1991, when Overland Sheepskin was still Troy's employer.

34. This interpretation is fully clarified by the final clause in the above-quoted paragraph. This clause specifically states that the scope of the agreement "includes the release of Overland Sheepskin Co., the predecessor in interest of Overland Outfitters, Inc., from any and all *Occupational Disease Disablement Act Claims and/or Workers' Compensation Act claims.*" (Emphasis added). Claims based on the Occupational Disease Disablement Act or Workers' Compensation Act can be raised only against an employer. *See* NMSA 1978, §§ 52–1–6, –8, –9 (Repl.Pamp.1991) (discussing applicability of Workers' Compensation Act to employers); NMSA 1978, §§ 52–3–6 to –8 (Repl. Pamp.1991) (discussing applicability of Occupational Disease Disablement Act to employers). Accordingly, the agreement can only be read as releasing Overland Sheepskin in its role as a previous employer potentially subject to Workers' Compensation claims or Occupational Disease Disablement Act claims.

35. Furthermore, extrinsic evidence of the circumstances surrounding the formation of the agreement does not support the possibility of a different interpretation. *See Hansen v. Ford Motor Co.,* 120 N.M. 203, 206, 900 P.2d 952, 955 (1995) (noting court properly may consider extrinsic evidence to determine whether or not terms of a release are in fact ambiguous). In a letter from Overland Outfitters' attorney to Troy's attorney on the day following the execution of the release, Overland Outfitters' attorney stated:

> I expressed to you my intention that the Complete Release and Settlement Agreement *release all workers' compensation claims and occupational disease claims* of any type. In so doing this also has the legal effect of releasing [Overland Outfit-

ters] from any negligence claims pursuant to the exclusivity provisions of the Workers' Compensation Act and the Occupational Disease Disablement Act. Along these lines, I expressed to you my belief that this same exclusivity provision would bar any claim by Mr. Garrity against Overland Sheepskin Company.

> .... I simply want to make clear that Respondents. are not endorsing any third party claims Mr. Garrity claims to have. Rather any claims Mr. Garrity has or may claim to have are governed by the express language of the Complete Release and Settlement Agreement and the current status of New Mexico Law.

Letter from R. Michael Shickich to Stephen D. Aarons (Mar. 2, 1993) (emphasis added).

36. This letter indicates that Overland Outfitters only intended to expressly release the employment-related claims for both itself and for Overland Sheepskin. In the letter, Overland Outfitters stated its belief that such a release would have the *legal effect* of also barring all other claims against itself and Overland Sheepskin. However, the legal effect of a release is for the courts to determine, and, indeed, we will address this issue below. For purposes of interpreting the agreement, this letter confirms that the parties did not expressly release all nonemployment claims against Overland Sheepskin. Overland Outfitters instead agreed to execute the more limited release and chose to stand on what it perceived to be the legal effect of that release.

37. In addition, we note that the letter sent by Troy's attorney, to which the above letter was responding, expressed a similar understanding of the agreement. Troy's affidavit to the Workers' Compensation judge in support of the settlement, which both parties initialed and which is referenced in the release agreement, also indicates that the parties intended the agreement to be a release of Overland Sheepskin for all employment-related claims.

B. The Overland Outfitters Release Does Not Preclude Troy's Third–Party Personal Injury Suit Against Overland Sheepskin

38. Overland Sheepskin next contends that, even if there had been no release

at all, Troy's claim would still be barred by the exclusivity provisions of the Workers' Compensation Act. *See* § 52–1–9 (stating that the Act provides the exclusive remedy for employees injured on the job); *see generally Harger v. Structural Servs., Inc.*, 121 N.M. 657, 916 P.2d 1324 (1996) (discussing exclusivity provisions of Workers' Compensation Act). Overland Sheepskin argues that the change in ownership of the Santa Fe store from Overland Outfitters to Overland Sheepskin was equivalent to a change in the internal structure of a single company. Overland Sheepskin points out that the inventory in the store at the time of the February sale became Overland Outfitters' property, except for the pelts, which Overland Sheepskin retained and put on consignment at Overland Outfitters' store. Overland Sheepskin therefore argues that Troy's claim should be treated as a claim against an employer that would be governed by Section 52–1–9 of the Workers' Compensation Act and by the release.

39. Troy counters that Overland Sheepskin and Overland Outfitters are two distinct corporations and that, after the sale, Overland Sheepskin was no longer in an employment relationship with Troy. He contends that, after the sale, Overland Sheepskin became a pelt supplier and continued to ship pelts to the Santa Fe store for sale on consignment for its own profit. Troy also presented evidence that he contracted brucellosis in March from one of Overland Sheepskin's pelts sent to the Santa Fe store after Overland Sheepskin had sold the store to Overland Outfitters.

■■■ 40. For legal support, both sides rely on cases addressing the dual-persona doctrine as backing their respective positions and cite cases discussing this doctrine. The dual-persona doctrine provides an exception to the exclusivity provisions of the Workers' Compensation Act in limited circumstances. Under the dual-persona doctrine, an employer may be treated as a third party, vulnerable to a tort suit by an employee, if, and only if, the employer possesses a second persona

sufficiently independent from and unrelated to its status as employer. *Salswedel v. Enerpharm, Ltd.*, 107 N.M. 728, 731, 764 P.2d 499, 502 (Ct.App.1988) (explaining that employer may be liable under dual-persona doctrine in its role as partner in real estate investment and management group that was responsible for maintaining unrelated property where employee suffered injury). However, the dual-persona doctrine is inapplicable in this case.

41. The real issue in this case is not whether Overland Sheepskin, as employer, has another persona as supplier. Instead the issue is whether Overland Sheepskin should be considered Troy's employer at all. If Overland Sheepskin and Overland Outfitters are sufficiently connected so as to represent in reality a single corporate owner and employer for the Santa Fe store, then Overland Sheepskin would gain the benefit of the exclusivity provisions of the Workers' Compensation Act, as well as the release. The dual-persona doctrine would not apply because Overland Sheepskin's role as pelt supplier would plainly be related to its role as surrogate store owner. If, on the other hand, Overland Sheepskin is independent of Overland Outfitters, then it ceased being Troy's employer on February 28, 1991, and would not be protected by the exclusivity provisions of the Workers' Compensation Act or the release.

42. As noted above, both sides in this case contest whether the sale represented a true change in ownership, which in turn will determine if Troy is entitled to maintain his suit against Overland Sheepskin as a pelt supplier. However, this argument is a factual dispute for the jury to evaluate after hearing all the evidence.

43. Overland Sheepskin also contests the date that Troy contracted brucellosis (as well as the fact that he contracted the disease at all). Of course, if Overland Sheepskin can demonstrate that Troy contracted the disease before February 28, 1991, during the time when Overland Sheepskin was still Troy's employer, then Troy's suit would be barred

under the terms of the release Troy entered into with Overland Outfitters. Again, this is a factual dispute for the jury to resolve. Having determined as a matter of law that the Troy's release and settlement with Overland Outfitters does not bar Troy's suit against Overland Sheepskin in its capacity as supplier and consignor of allegedly infected pelts, we hold that the trial court erred in granting summary judgment for Overland Sheepskin on Troy's third-party, personal-injury claim.

## IV. CONCLUSION

44. For the foregoing reasons we affirm the trial court's grant of Overland Outfitters' motion for directed verdict against Joan Garrity and Dawn Garrity Wood on their breach of contract and retaliatory-discharge claims. We reverse the trial court's grant of summary judgment against Troy Garrity in his personal-injury claim against Overland Sheepskin, and we remand that case for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

RANSOM, BACA and FRANCHINI, JJ., and DIANE DAL SANTO, District Judge, concur.