The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **August 29, 2023**

**No. A-1-CA-39774**

**MANUEL LERMA,**

      Plaintiff-Appellant,

v.

**STATE OF NEW MEXICO and NEW MEXICO DEPARTMENT OF CORRECTIONS,**

      Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**James Lawrence Sanchez, District Court Judge**

The Gilpin Law Firm, LLC
Donald G. Gilpin
Kenneth C. Detro
Christopher P. Machin
Albuquerque, NM

for Appellant

Stiff, Garcia & Associates, LLC
John S. Stiff
Julia Y. Parsons
Albuquerque, NM

for Appellees

**OPINION**

**IVES, Judge.**

{1}    Plaintiff Manuel Lerma appeals a district court order granting summary judgment in favor of Defendants State of New Mexico and New Mexico Department of Corrections (DOC) on Mr. Lerma's claim of retaliation under New Mexico's Whistleblower Protection Act (NMWPA).[1] *See* NMSA 1978, §§ 10-16C-1 to -6 (2010). Mr. Lerma's claims of error require us to assess the merits of DOC's four summary judgment theories: (1) that Mr. Lerma's communications to DOC are not protected by the NMWPA; (2) that DOC did not take any "adverse employment action," § 10-16C-2(D), against Mr. Lerma, as required by Section 10-16C-3; (3) that a retaliatory motive did not cause DOC to take the actions complained of by Mr. Lerma, *see* § 10-16C-3; and (4) that DOC established an affirmative defense because it took the actions complained of by Mr. Lerma for a "legitimate business purpose unrelated to conduct prohibited pursuant to the [NMWPA]" and "retaliatory action was not a motivating factor." Section 10-16C-4(B). Because we conclude that summary judgment was unwarranted under all four of DOC's theories, we reverse and remand for further proceedings.

---

[1]In this opinion, we refer to the statutory scheme at issue here as the NMWPA to distinguish the whistleblower statutes enacted by our Legislature from the federal Whistleblower Protection Act (WPA). *See* 5 U.S.C. 2302(b)(8)-(9).

{2}     This appeal presents significant legal questions, including questions of first impression, about the type of conduct protected by the NMWPA. As to the questions of first impression, we conclude that communications made through ordinary workplace channels or as part of an employee's normal work duties are not excluded from protection, and that an employee's motive and intent have no bearing on whether a communication is protected. We also conclude that whether a communication is protected by the NMWPA does not hinge on whether the communication pertains to a matter of public concern or on whether the communication benefits the public. To reach this conclusion, we review and ultimately reject some of the reasoning in *Wills v. Board of Regents of the University of New Mexico*, 2015-NMCA-105, 357 P.3d 453.

**BACKGROUND**

{3}     Because summary judgment was entered for DOC, we recite the facts in the light most favorable to Mr. Lerma. *See Ulibarri v. N.M. Corr. Acad.*, 2006-NMSC-009, ¶ 2, 139 N.M. 193, 131 P.3d 43. In 2018, Mr. Lerma, a corrections officer employed by the DOC, transferred from Southern New Mexico Correctional Facility to Central New Mexico Correctional Facility. Upon assuming his new post at Central, Mr. Lerma was tasked with operation of the prison's outer sally ports—the two sets of security gates where vehicles enter and exit. Mr. Lerma believed that, for safety purposes, the "standard procedure" was to keep at least one of the two sally

port gates closed at all times. But some of Mr. Lerma's coworkers in the transport department thought he was being "too strict" with the sally port gates. He testified that these coworkers wanted him to "leave both of them open so they could come and go as they pleased." Mr. Lerma testified that he told his supervisor about this disagreement, but that "nothing was ever done."

{4}     Mr. Lerma and his coworkers also had ongoing interpersonal difficulties that eventually led to violence. Mr. Lerma believed these difficulties were because his coworkers "had an issue with [him] for being from Southern," and Central was a "tight-knit community" in which outsiders often experienced harassment. One day after work, Mr. Lerma was leaving the facility when two of his coworkers—a lieutenant and a fellow officer—told Mr. Lerma that "if [he] wanted to handle the problem that [they] had, for [Mr. Lerma] to follow them." Once the three were on the road in their respective cars, the officer and the lieutenant "kept blocking [Mr. Lerma] in" and following him as he tried to get away from them. Eventually, the three vehicles came to a stop in an empty lot. Mr. Lerma got out and told the lieutenant—his direct supervisor—that the lieutenant "was making it into a bigger deal than what it should be," and that, as a supervisor, "he should know better." While Mr. Lerma was speaking to the lieutenant, the officer came up behind Mr. Lerma. When Mr. Lerma turned around, the officer "was standing there with his fists clenched," and a fight ensued. The lieutenant stood nearby filming the fight on his

3

state-issued cell phone. The officer and the lieutenant eventually departed, leaving Mr. Lerma on the ground.

{5}     The next work day, Mr. Lerma reported the fight to a different supervisor—the director of the Security Threat Investigative Unit at Central—and the prison leadership began to investigate. In the course of the investigation, Mr. Lerma told various people, including a pair of deputy wardens, what happened. After meeting with the deputy wardens—and one day after he reported the fight—DOC reassigned Mr. Lerma from his post at the sally port to the prison's mailroom. Mr. Lerma was given no reason for the move and felt he was "being punished." Mr. Lerma testified that following his reassignment, his compensation decreased because he was "very, very, limited" in the amount of overtime he could work in the mailroom, and that his supervisors were aware that the reason he transferred to Central was to work more overtime. In addition to transferring Mr. Lerma, DOC limited where Mr. Lerma was allowed to go in the facility. The deputy warden who made the initial decision to move Mr. Lerma to the mailroom testified that he "wanted [Mr. Lerma] . . . closer by me so I could keep an eye out for him" following his "report[] to us that he was in a physical altercation."

{6}     Mr. Lerma filed a complaint for damages under the NMWPA, alleging that he had communicated to DOC his "good faith belief that unethical and illegal conduct was occurring," and that as a result DOC "retaliated . . . by not allowing [Mr. Lerma]

4

to receive overtime or other benefits." Mr. Lerma's theory of the case involved two discrete communications that he argued were protected under the NMWPA: his reporting of the disagreement regarding the operation of the sally port and his reporting of the after-work fight involving the officer and the lieutenant.

{7}     DOC moved for summary judgment on four alternative theories: (1) Mr. Lerma's communications are not protected; (2) DOC did not take any adverse employment action against Mr. Lerma; (3) DOC did not act with a retaliatory motive; and (4) DOC had a legitimate business purpose for acting as it did after receiving Mr. Lerma's communications. The district court granted the motion without explaining which of these theories it accepted, stating only that "there is no genuine issue as to any material fact and that [DOC is] entitled to a [j]udgment as a matter of law." Mr. Lerma appeals.

**DISCUSSION**

{8}     New Mexico courts "view summary judgment with disfavor, preferring a trial on the merits." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 8, 148 N.M. 713, 242 P.3d 280. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582; *see also* Rule 1-056(C) NMRA. We review summary judgment de novo, *Ulibarri*, 2006-NMSC-009, ¶ 7, "resolv[ing] all reasonable inferences in favor of the party opposing

summary judgment," and "view[ing] the pleadings, affidavits, depositions, answers to interrogatories, and admissions in the light most favorable to a trial on the merits." *Madrid v. Brinker Rest. Corp.*, 2016-NMSC-003, ¶ 16, 363 P.3d 1197 (internal quotation marks and citation omitted).

{9} Where, as here, "alternative grounds for summary judgment have been presented to the [district] court," the court must "specify the grounds upon which the order is based." Rule 1-056(C). Because the order in this case does not conform to Rule 1-056(C), we are unable to discern which of DOC's alternative theories were accepted by the district court, and we must consider all four of them. We conclude that all lack merit, and we therefore reverse.

## I.    Protected Conduct

{10} In the district court, DOC argued that the NMWPA did not protect the communications at issue for three reasons: (1) they were "made as part of his normal duties made through normal channels as [a DOC] employee"; (2) Mr. Lerma could not "show his reporting was done with the intent of serving the public interest"; and (3) the communications did not pertain to a matter of public concern and that the communications primarily benefited Mr. Lerma rather than the public.[2] As we will explain, we do not believe that any of these arguments has merit.

---

[2]Although DOC disclaimed reliance on the first and second arguments during oral argument in this Court, we must address those arguments because the district court may have relied on one or both of them.

{11} Although any analysis of what the Legislature intended to protect must be driven primarily by the plain language of the NMWPA, *see Martinez v. Cornejo*, 2009-NMCA-011, ¶ 11, 146 N.M. 223, 208 P.3d 443, DOC does not argue that the statutory text supports any of the arguments it presented in its summary judgment motion, and we find no support in that text or in the pertinent uniform jury instruction. As it relates to protected communications, the NMWPA prohibits retaliation against a public employee who "communicates to the public employer or a third party information about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act." Section 10-16C-3(A). The NMWPA defines "unlawful or improper act" as "a practice, procedure, action or failure to act on the part of a public employer that: (1) violates a federal law, a federal regulation, a state law, a state administrative rule or a law of any political subdivision of the state; (2) constitutes malfeasance in public office; or (3) constitutes gross mismanagement, a waste of funds, an abuse of authority or a substantial and specific danger to the public." Section 10-16C-2(E). Significantly, this statutory language—and nothing more of relevance—is used to describe conduct protected by the NMWPA in a uniform jury instruction, UJI 13-2322 NMRA, that was adopted by our Supreme Court and that is therefore a presumptively correct statement of the law. *State v. Wilson*, 1994-NMSC-009, ¶ 5, 116 N.M. 793, 867 P.2d 1175. We have found nothing in the text of the NMWPA or in UJI 13-2322 that

requires that a communication be made outside normal workplace channels or outside an employee's ordinary job duties; that the employee communicate with any particular intent or motive; or that the communication pertain to a matter of public concern or benefit the public.

{12}     Lacking support for these requirements in the NMWPA's text, DOC has relied largely on federal precedent interpreting federal whistleblower laws and New Mexico precedent regarding the common law tort of retaliatory discharge in violation of public policy. As we will explain, we do not believe these precedents, or the single NMWPA case on which DOC relies, accurately describe the law regarding protected conduct under the NMWPA. We therefore reject all three requirements.

{13}     We reject the first proposed requirement because, in addition to finding no foothold in the text of the NMWPA, this requirement is based on discredited federal precedent interpreting the WPA. In *Willis v. Department of Agriculture*, 141 F.3d 1139, 1144 (Fed. Cir. 1998), the Federal Circuit suggested that communications made in the course of "merely performing . . . required duties" are not protected by the WPA, and in *Kahn v. Department of Justice*, 618 F.3d 1306, 1313 (Fed. Cir. 2010), the Federal Circuit concluded that "an employee must communicate the information either outside the scope of his normal duties or outside of normal channels to qualify as a protected disclosure." New Mexico's courts do not

8

necessarily follow federal whistleblower precedent. *See Velasquez v. Regents of N. N.M. Coll.*, 2021-NMCA-007, ¶ 31, 484 P.3d 970 ("[W]e have never concluded that the protections of the [NM]WPA are identical to those of the federal statute in every respect or that we will interpret the [NM]WPA in lockstep with federal precedent."). And we will not follow federal precedent here, primarily because it strays from the text of the NMWPA, which broadly protects "communicat[ions] to the public employer or a third party" and which does not exclude communications made through normal channels or as part of the employee's ordinary duties. Section 10-16C-3(A). Had our Legislature intended to exclude this subset of communications, it would have said so in the text. Even as a matter of federal law, Congress has made clear that it never intended to exclude communications made through normal channels or as part of ordinary duties, and Congress has amended the federal statute to abrogate *Willis* on this point. *See* 5 U.S.C. § 2302(f)(1)(A) (clarifying that "[a] disclosure shall not be excluded" from the protections of the WPA because, among other reasons, "the disclosure was made to a supervisor"); 5 U.S.C. § 2302(f)(2) (clarifying that a disclosure "made during the normal course of duties of an employee" whose principal job is to report wrongdoing is generally covered under the WPA); S. Rep. No. 112-155, at 5 (2012) (observing that the *Willis* court "stated that a disclosure made as part of an employee's normal job duties is not protected," explaining that this statement is "contrary to congressional intent for the WPA," and

9

faulting the Federal Circuit for failing to "apply[] the very broad protection required by the plain language of the WPA"); *accord Daniels v. Merit Sys. Prot. Bd.*, 832 F.3d 1049, 1051-52 (9th Cir. 2016) (noting that in 2012 "Congress identified and abrogated specific judicial decisions by the Federal Circuit that had concluded that disclosures made in certain contexts (for example, during the course of an employee's regular duties, or where the information disclosed was already known) would not be eligible for WPA protection"). We are aware of no persuasive basis for excluding communications made through normal channels or as part of an employee's ordinary duties, and we reject such an exclusion as inconsistent with the intent of our Legislature as expressed in the NMWPA's text.

{14} For similar reasons we reject the second proposed requirement—that the NMWPA protects only communications made by an employee with "the intent of serving the public interest." We are not persuaded that we should follow federal precedent and engraft an intent or motive requirement onto the description of protected conduct in the NMWPA's text. The Federal Circuit's opinion in *Willis* appears to suggest that the federal whistleblower statute imposes an intent or motive requirement. The *Willis* court reasoned that "[t]he WPA is designed to protect employees who risk their own personal job security for the benefit of the public," and that the plaintiff's disclosure was not protected in part because of the plaintiff's "intent." 141 F.3d at 1143. But the NMWPA says nothing about the intent or motive

10

of the employee. To conclude that such a requirement exists, we would have to add text to the NMWPA; we will not do so because the statute makes sense as written. *See State v. Torres*, 2006-NMCA-106, ¶ 8, 140 N.M. 230, 141 P.3d 1284. Even if we were to ignore this clear contradiction between the NMWPA's text and the notions about intent and motive in *Willis*, we would not rely on *Willis* to create a motive or intent requirement because Congress has clarified that such a requirement is inconsistent with congressional intent. *See* 5 U.S.C. § 2302(f)(1)(C) (clarifying that "[a] disclosure shall not be excluded" from the protections of the federal WPA because of, among other reasons, "the employee's or applicant's motive for making the disclosure"); S. Rep. No. 112-155, at 5 (2012) ("The bill also clarifies that an employee does not lose protection simply because of the employee's motive for making the disclosure."). For these reasons, we conclude that an employee's intent or motive has no bearing on whether conduct is protected by the NMWPA.

{15} Turning to the third requirement proposed by DOC, we conclude that whether a communication is protected under the NMWPA does not hinge on whether the communication pertains to a matter of public concern or on whether the communication furthers a public interest rather than a private one. DOC acknowledges that no such requirement is found in the text of the NMWPA, but DOC argues that the requirement is supported by two precedents: *Garrity v.*

11

*Overland Sheepskin Co. of Taos*, 1996-NMSC-032, 121 N.M. 710, 917 P.2d 1382, and *Wills*, 2015-NMCA-105. We discuss each precedent in turn.

{16}     *Garrity* is unhelpful to DOC because *Garrity* did not discuss what communications are protected by the NMWPA but instead what communications are protected by the common law in the context of one type of retaliatory discharge claim, and these two bodies of law protect different conduct. In the NMWPA, which serves to "promote[] transparent government and the rule of law," *Flores v. Herrera*, 2016-NMSC-033, ¶ 9, 384 P.3d 1070, our Legislature chose to protect communications by public employees about "unlawful or improper act[s]," § 10-16C-3(A), of "public employer[s]." Section 10-16C-2(E). By contrast, in *Garrity*, our Supreme Court explained the circumstances under which the common law protects private employees from retaliation for making a disclosure about the conduct to a private employer. 1996-NMSC-032, ¶ 24.

{17}     The plaintiffs in *Garrity* argued that they did not need to prove that their internal disclosures had "actual public benefit." *Id.* ¶ 21. Our Supreme Court disagreed. Recognizing that the common law claim for retaliatory discharge "is a narrow exception to the rule of employment at will" and that our courts have "refused to expand its application," the Court concluded that the plaintiffs' "open-ended rule would broaden the public-policy exception to the at-will doctrine beyond its limited purpose." *Id.* To calibrate this exception so that it would serve its intended

purpose, the Court concluded that a private employee whose disclosures are made to a private employer must show that "the employee's actions furthered some singularly public purpose," and that an employee could not prevail if their actions "served primarily to benefit the private interest of the employer or employee." *Id.* ¶ 24; *see also* UJI 13-2304 NMRA use notes (requiring the jury to be instructed about the public versus private interest distinction in cases in which the plaintiff reported wrongdoing to a private party rather than public authorities).

{18}    This limitation was not codified in the NMWPA, contrary to DOC's contention at oral argument. Neither the language used by our Supreme Court in *Garrity* nor any similar language appears anywhere in the NMWPA (or in the presumptively correct uniform jury instructions for NMWPA cases). We therefore conclude that the limitation set forth in *Garrity* does not apply to claims brought under the NMWPA.

{19}    We now turn to *Wills*, in which this Court stated that the NMWPA only protects communications that "benefit[] the public by exposing unlawful and improper actions by government employees," and that "communications regarding personal personnel grievances that primarily benefit the individual employee" are not protected. 2015-NMCA-105, ¶ 20. As we will explain, *Wills* imposed that limitation based on unsound reasoning.

{20}    In *Wills*, the plaintiff alleged that his former employer withheld his "contractually agreed-upon pay," and that by communicating that allegation, the plaintiff was disclosing an "abuse[ of] authority" under the NMWPA. 2015-NMCA-105, ¶¶ 3-5, 16; *see* §§ 10-16C-2(E)(3), -3(A). The district court dismissed the plaintiff's claim because his allegations did not show that his conduct was protected by the NMWPA. *Wills*, 2015-NMCA-105, ¶ 13. On appeal, the question for this Court was one of statutory interpretation: whether a single breach of a contractual term related to the compensation of a single employee was an "abuse of authority" under Section 10-16C-2(E)(3). This Court held that it was not but reached that holding based on reasoning that is both methodologically and substantively flawed.

{21}    It is methodologically flawed because its approach to statutory interpretation is contrary to our Supreme Court's precedent, which requires courts to "look[] first to the words the Legislature chose and the plain meaning of the language." *State v. Moya*, 2007-NMSC-027, ¶ 6, 141 N.M. 817, 161 P.3d 862; *see also* NMSA 1978, § 12-2A-19 (1997) ("The text of a statute . . . is the primary, essential source of its meaning."). But the *Wills* court did not start with—or ever discuss—the plain meaning of the key statutory phrase, "abuse of authority," or of any other text in the NMWPA. Skipping this essential and sometimes dispositive step, the *Wills* court looked for an answer in precedents regarding the federal whistleblower statute.

14

{22} This brings us to the substantive flaw: the *Wills* court's misinterpretation of the federal whistleblower precedents. The *Wills* court relied on statements in those precedents that pertained to the policy underlying the federal statute, but the *Wills* court mistakenly treated those statements as expressions of a legal requirement that a communication is only protected if it benefits the public.[3] *See Wills*, 2015-NMCA-105, ¶¶ 19-21. No such requirement is found in the cited federal precedents.

{23} Whatever the merits of the plaintiff's claim in *Wills*, the *Wills* court's reasoning cannot be reconciled with the plain text of the NMWPA or with New Mexico's established rules of statutory interpretation, and the reasoning is not supported by the federal precedent on which the *Wills* court relied. We therefore reject the public benefit limitation adopted by *Wills*.

{24} Our conclusion is buttressed by the uniform jury instructions for NMWPA cases that were adopted by our Supreme Court after *Wills* was decided. Like the text of the NMWPA itself, neither the uniform instruction on protected activity—UJI 13-

---

[3]Policy considerations should only come into play if the plain meaning of the statutory text is unclear, *see, e.g.*, *Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 37, 147 N.M. 583, 227 P.3d 73, or if strict application of the plain meaning rule would produce results that are "absurd, unreasonable, or contrary to the spirit of the statute." *State v. Smith*, 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022. Even if the *Wills* court had determined that it was necessary to use public policy as an interpretive tool, it is not clear to us that the federal precedents relied on in *Wills* accurately describe the policy that our Legislature sought to advance when it enacted the NMWPA. *See Flores*, 2016-NMSC-033, ¶ 9 (stating that the NMWPA "promotes transparent government and the rule of law").

2322—nor any of the other uniform jury instructions regarding the NMWPA requires a plaintiff to prove that the communication benefited the public. Importantly, these instructions were adopted by our Supreme Court over seven years after *Wills* was decided. *See* UJI 13-2321 to -27 NMRA (adopted Dec. 31, 2022). Had our Supreme Court believed that a plaintiff seeking redress under the NMWPA is required to prove that the plaintiff's communication benefited the public, surely the Court would have said so somewhere in the UJIs.

{25}    For these reasons, we conclude that a plaintiff in a NMWPA case is not required to prove that the plaintiff's communication pertains to a matter of public concern or that the communication benefits the public. No such requirements appear in the text of the NMWPA, and we decline to superimpose additional requirements on those selected by our Legislature.

{26}    Applying all of our legal conclusions about the scope of protected conduct under the NMWPA, we see no sound basis for any of the arguments that DOC presented to the district court. None of those arguments allow us to affirm the grant of summary judgment.

**II.    Adverse Employment Action**

{27}    DOC's next alternative basis for summary judgment is that the evidence did not raise a genuine issue of material fact as to whether DOC took any "retaliatory action," § 10-16C-3—specifically, any "adverse employment action," § 10-16C-

16

2(D)—against him. DOC argues that Mr. Lerma's move to the mailroom "does not constitute an adverse employment action under the NMWPA, because the reassignment was not a significant change in [Mr. Lerma]'s employment status." According to DOC, Mr. Lerma "was not demoted, his hourly pay rate was not changed, and the hours and days of the week he worked did not change." Mr. Lerma does not dispute these facts, but argues that a genuine issue of material fact exists because his move "resulted in a significant change to his job duties" and he was "adversely impacted financially" because his opportunities for working overtime were limited in the mailroom.

{28}     We agree with Mr. Lerma because, in our view, the evidence presented at the summary judgment stage, viewed in the light most favorable to Mr. Lerma, gives rise to a genuine issue of material fact as to whether DOC took adverse employment action against him. The NMWPA prohibits "any retaliatory action [taken] against a public employee" because the employee engaged in protected activity under the statute. Section 10-16C-3. Our Legislature has defined "retaliatory action" broadly as "*any* discriminatory or adverse employment action against a public employee in the terms and conditions of public employment." Section 10-16C-2(D) (emphasis added). Under this definition, actions short of termination may suffice. *See Dart v. Westall*, 2018-NMCA-061, ¶ 23, 428 P.3d 292 (concluding that the evidence sufficed to support a jury finding of "retaliatory action" under the NMWPA where

17

the defendant reassigned the plaintiff to a new division, "created a hostile work environment, made humiliating comments about him to his colleagues, issued him a substandard work vehicle, and required him to surrender his key to the forensic lab and cease investigating his caseload of crimes against children"). Under this legal standard, a reasonable jury could find that DOC took adverse employment action. *See Zamora v. St. Vincent Hosp.*, 2014-NMSC-035, ¶ 25, 335 P.3d 1243 (concluding that questions of material fact precluded summary judgment for the defendant because a reasonable jury could rule in favor of the plaintiff). DOC reassigned Mr. Lerma from the sally port to the mailroom, which changed his duties, *see Dart*, 2018-NMCA-061, ¶ 23 (relying in part on reassignment and change of duties); DOC restricted Mr. Lerma's movement in the prison, *see id.* (relying in part on restriction on the plaintiff's ability to access the forensic lab); and the reassignment reduced the amount of overtime income Mr. Lerma earned.[4] Because we believe that this evidence gives rise to a genuine issue of material fact regarding retaliatory action, we hold that summary judgment was not warranted as to that element of Mr. Lerma's NMWPA claim. If the district court entered summary judgment on that element, it erred.

---

[4] Although the evidence of financial harm to Mr. Lerma supports our conclusion, we note that a plaintiff need not prove financial harm to establish retaliatory action under the NMWPA. *See Dart*, 2018-NMCA-061, ¶ 23 (concluding that substantial evidence supported the jury's finding of adverse employment action where there was no evidence of financial harm).

## III.  Causation

{29}  DOC contends that there is no genuine issue of material fact as to whether a retaliatory motive caused DOC to reassign Mr. Lerma and restrict his movement in the prison. DOC makes two discrete but closely related arguments. First, it argues that summary judgment is warranted as to the causation element of Mr. Lerma's claim because he failed to present adequate evidence that DOC had a retaliatory motive for reassigning him and restricting his movement. *See* § 10-16C-3 ("A public employer shall not take any retaliatory action against a public employee *because* the public employee [engages in protected NMWPA conduct.]" (emphasis added)); *see also* UJI 13-2321 (identifying causation as an element of a claim under the NMWPA). Second, DOC argues that summary judgment is warranted on DOC's affirmative defense that DOC had a "legitimate business purpose," § 10-16C-4(B), for the actions that Mr. Lerma contends were motivated by retaliation. We consider each of DOC's arguments in turn, concluding that both lack merit because, viewing the evidence in the light most favorable to Mr. Lerma, a reasonable jury could conclude that retaliation was a motivating factor.

## A.  Causation as an Element

{30}  Under the NMWPA, it is a plaintiff's burden to establish a causal connection between protected activity and the retaliatory action at issue. *See* § 10-16C-3; UJI 13-2321. Although the NMWPA does not elaborate on the causation element, our

Supreme Court has adopted a uniform jury instruction explaining that "engagement in protected activity is a cause of an employer's retaliatory action if the employee's protected activity was a factor that motivated, at least in part, the employer's action against the employee." UJI 13-2324. Importantly, the instruction defines "motivating factor" as "a factor that plays a role in an employer's decision to act," and explains that "[an] employee's protected activity need not be the only reason, nor the last reason, nor latest reason, for the employer's action." *Id.*

{31} We believe that the evidence in the record, viewed in the light most favorable to Mr. Lerma, would allow a reasonable jury to find that DOC's reassignment of Mr. Lerma and the restriction it placed on his movement were motivated, at least in part, by retaliation for the communications that he alleges are protected by the NMWPA. *See Zamora*, 2014-NMSC-035, ¶ 25 (concluding that questions of material fact precluded summary judgment because a reasonable jury could have ruled in favor of the nonmovant). Mr. Lerma was reassigned to the mailroom the day after he reported the fight—timing that could support a reasonable inference that the retaliation was at least one factor that motivated DOC. *See Velasquez*, 2021-NMCA-007, ¶ 41 ("Temporal proximity between protected conduct and adverse employment action is one factor that may support an inference of retaliatory motive."). Further support for such an inference is Mr. Lerma's testimony that when DOC reassigned him, he felt he was "being punished for something that [he] had no control of." *See*

*Dart*, 2018-NMCA-061, ¶ 24 (finding sufficient evidence to support a jury finding of NMWPA causation on the basis of temporal proximity and the plaintiff "voicing his belief" that his NMWPA communication "was a motivating factor" in the retaliation). An inference of retaliation could also be bolstered by the testimony of the deputy warden of the prison who made the initial decision to reassign Mr. Lerma. He explained that he "wanted [Mr. Lerma] . . . closer by me so I could keep an eye out for him" after he "reported to us that he was in a physical altercation." Although this testimony is open to interpretation, we believe that one reasonable interpretation is that DOC's reaction was motivated—at least in part—by retaliation. Ultimately, whether retaliation was a motivating factor is a question of fact, and because we believe that a jury could reasonably infer that retaliation was a factor, we conclude that this material fact is disputed. *Cf. Bovee v. State Highway & Transp. Dep't*, 2003-NMCA-025, ¶ 16, 133 N.M. 519, 65 P.3d 254 (noting that in Title VII cases, "discriminatory intent is a factual question and that neither trial courts nor reviewing courts should treat discrimination differently from other ultimate questions of fact" (internal quotation marks and citation omitted)). If the district court entered summary judgment on the causation element, we hold that it erred.

**B.    Affirmative Defense Regarding Causation**

{32}    The final remaining basis on which summary judgment might have been granted is DOC's argument that it had a legitimate business purpose for reassigning Mr. Lerma and restricting his freedom of movement and that Mr. Lerma failed to set forth evidence that DOC's legitimate business purpose was pretext designed to conceal retaliation. Here DOC invokes Section 10-16C-4(B), which provides, in pertinent part, that an employer has "an affirmative defense" to a NMWPA action if "the action taken by" the employer against the employee "was due to" a "legitimate business purpose unrelated to conduct prohibited pursuant to the [NMWPA] and that retaliatory action was not a motivating factor." As the statutory language makes clear, DOC can only prevail on its affirmative defense at the summary judgment stage if there is no genuine dispute about whether retaliation was a motivating factor. But, as we have explained, there is a genuine dispute as to that question. We therefore hold that if the district court granted summary judgment based on DOC's affirmative defense, the district court erred.

**CONCLUSION**

{33}    Because we conclude that there is no sound basis for the entry of summary judgment in favor of DOC, we reverse and remand for further proceedings.

{34}    **IT IS SO ORDERED.**

 

_____

**ZACHARY A. IVES, Judge**

22

**WE CONCUR:**

_____

**GERALD E. BACA, Judge**

_____

**MICHAEL D. BUSTAMANTE, Judge, retired, sitting by designation**