2004-NMCA-021

85 P.3d 252

Don GORMLEY, Plaintiff–Appellant,

v.

COCA–COLA ENTERPRISES, Defendant–Appellee.

No. 22,722.

Court of Appeals of New Mexico.

Dec. 16, 2003.

Certiorari Granted, No. 28,441, Jan. 26, 2004.

W.T. Martin, Jr., Law Offices of W.T. Martin, Jr., P.A., Carlsbad, NM, for Appellant.

Christopher M. Moody, Anne Marie Turner, Noeding & Moody, P.C., Albuquerque, NM, T. Harold Pinkley, Miller & Martin LLP, Nashville, TN, for Appellee.

*OPINION*

CASTILLO, Judge.

{1} Don Gormley (Plaintiff) appeals the district court's grant of summary judgment on his claims of breach of implied employment contract, constructive discharge, age discrimination, and disability discrimination. We reverse in part and remand on the sole issue of breach of contract for duties and hours.

## I. BACKGROUND

{2} Plaintiff was employed by Southwest Coca–Cola (Southwest) at its Hobbs, New Mexico, facility beginning in 1983. For approximately ten years, Plaintiff was a route driver and deliveryman, a job requiring manual labor and lifting. Around 1994, at age fifty-eight, Plaintiff was assigned to a warehouse position, in which he performed lighter duties, including loading and checking in trucks, doing janitorial work, performing cashier duties, making bank deposits, filling out paperwork, going to the post office and bus station, getting gas for the forklifts, stacking shelves, and cleaning the trailers of trucks. He had not complained about the work he had been doing on the truck route.

{3} Plaintiff presented deposition testimony of Robert Bolin, regional manager for Southwest at the time of Plaintiff's assignment to the warehouse. In his testimony about the transfer, Bolin explained that at the time, Plaintiff was healthy and "running the route okay" but management was concerned that Plaintiff might be hurt in the future because of his age and workload. Bolin testified that Plaintiff was to continue with fifty-five hours of work per week after his assignment to the warehouse so that Plaintiff would make the same amount he was making as a route driver. Bolin also testified that he discussed with Plaintiff leaving him "in that position until he was ready to retire." Plaintiff testified that Bolin guaranteed him fifty-five hours of work per week and that Bolin "just wanted to make sure that I want to stay with Coke as long as I could, until I got ready to retire, and he didn't want me to get [hurt by] lifting heavy stuff."

{4} In June 1998, Coca–Cola Enterprises (Defendant) acquired Southwest by merger; Defendant acknowledged in oral argument that all of Southwest's legal obligations were assumed through the merger. For a brief period of time after the merger, Plaintiff continued with his "same [warehouse] duties" and with the "same hours." Around July 1998, however, Plaintiff's new supervisor, Ruben Cardona, reduced Plaintiff's hours by five and made it clear that Plaintiff was no longer guaranteed fifty-five hours of work per week. Plaintiff did not protest this decision. Defendant subsequently further decreased Plaintiff's hours and changed certain of his job duties. Plaintiff submitted a letter of resignation to Defendant on August 21, 1999, to be effective September 17, 1999. Plaintiff never received written reprimands or discipline concerning his job performance from Southwest or from Defendant.

{5} In May 2000, Plaintiff filed his initial complaint against Defendant, setting forth his contract and constructive discharge claims and alleging that Defendant's conduct violated public policy against age discrimination, as articulated in the New Mexico Human Rights Act, NMSA 1978, §§ 28–1–1 to –15 (1969, as amended through 2003) (Act). Plaintiff did not file a grievance with the Human Rights Commission, as provided for under the Act. *See* § 28–1–10. In his complaint, Plaintiff sought reinstatement and damages. On March 9, 2001, Defendant filed a motion for summary judgment on all of Plaintiff's claims. Six days later, Plaintiff filed a motion to amend his complaint to add a count for discrimination, based on perceived disability and failure to continue to reasonably accommodate. The district·court granted partial summary judgment on the claims of breach of implied contract, constructive discharge, and age discrimination. The district court later granted summary judgment on Plaintiff's disability discrimination claim, finding that the claim did "not sound in common law tort" and that Plaintiff was required first to pursue the administrative procedure under the Act.

## II. DISCUSSION

### A. Standard of Review

{6} Summary judgment is proper where there is no evidence raising a reasonable doubt that a genuine issue of material fact exists. *Cates v. Regents of the N.M. Inst. of Mining & Tech.*, 1998–NMSC–002, ¶ 9, 124 N.M. 633, 954 P.2d 65. "When reviewing a [district] court's grant of summary judgment, we view the facts in the light most favorable to the party opposing summary judgment, drawing all inferences in favor of that party." *Stieber v. Journal Publ'g Co.*, 120 N.M. 270, 271–72, 901 P.2d 201, 202–03 (Ct.App.1995).

### B. Plaintiff's Claims

{7} Plaintiff's claims can be divided into those alleging discrimination and those related to an implied contract of employment. We address these issues in turn.

### 1. Age and Disability Discrimination Claims

■ {8} We agree with the district court that Plaintiff's age and disability claims must be pursued under the administrative procedures available in the Act and do not lie in common law tort. We have permitted employees to pursue claims without filing a human rights complaint under three tort theories: retaliatory discharge, *Gandy v. Wal–Mart Stores, Inc.*, 117 N.M. 441, 445, 872 P.2d 859, 863 (1994); intentional infliction of emotional distress, *Phifer v. Herbert*, 115 N.M. 135, 139, 848 P.2d 5, 9 (Ct.App.1993), *overruled on other grounds, Spectron Dev. Lab. v. Am. Hollow Boring Co.*, 1995–NMCA–025, ¶¶ 31–32, 123 N.M. 170, 936 P.2d 852; and prima facie tort, *Beavers v. Johnson Controls World Servs., Inc.*, 120 N.M. 343, 351, 901 P.2d 761, 769 (Ct.App.1995). At oral argument, Plaintiff acknowledged that he is not pursuing any of these tort theories. Instead, he requests that we create new torts for age discrimination and disability discrimination. We decline to accede to this request.

{9} Plaintiff bases his request on a broad reading of *Phifer*, in which this Court held that the plaintiff could pursue a sexual discrimination claim outside of the Act. *Phifer*, 115 N.M. at 139, 848 P.2d at 9. Because a sexual discrimination claimant need not exhaust administrative remedies under the Act, Plaintiff contends, neither should one raising age and disability discrimination claims. We decline to interpret *Phifer* so broadly. The *Phifer* case was not decided on the basis of the sexual discrimination claim but rather on the basis that the allegations of sexual discrimination were sufficient to support a separate claim for intentional infliction of emotional distress. *Id.* As conceded by Plaintiff, his complaint is insufficient to support a claim for intentional infliction of emotional distress or claims for retaliatory discharge or prima facie tort.

■ {10} At oral argument, Plaintiff also pointed this Court to a memorandum opinion, *Andazola v. Northern Automotive Corp.*, No. 18,708 (N.M.Ct.App. Nov. 13, 1997) (unpublished opinion), in support of his argument. While an unpublished opinion of this Court is of no precedential value, it may be presented

to this Court for consideration if a party believes it persuasive. Rule 12–405(C) NMRA 2003; *State v. Gonzales*, 110 N.M. 218, 227, 794 P.2d 361, 370 (Ct.App.1990). We do not find it persuasive, however. At issue in *Andazola* was whether exhaustion of administrative remedies under the Act is a prerequisite to proceeding with an independent tort claim. *Andazola*, No. 18,708, slip op. at 1. We reiterated in that opinion that exhaustion is not a prerequisite, and we allowed the plaintiff to pursue his intentional infliction of emotional distress and prima facie tort claims. *Id.* at 2. But Plaintiff here is not pursuing one of those tort claims; and we do not read *Andazola* as supporting the creation of new independent torts of discrimination, as sought by Plaintiff.

{11} We decline to permit employees to pursue age and discrimination claims outside of the Act that do not contain allegations sufficient to meet the elements of retaliatory discharge, intentional infliction of emotional distress, prima facie tort, or other existing independent torts. To do so would eviscerate the Act our legislature adopted. Because we conclude that Plaintiff must pursue the administrative remedies contained in the Act, we do not determine the substance of his discrimination argument. We hold that the district court did not err in granting summary judgment on the discrimination claims.

### 2. Constructive Discharge

{12} Plaintiff alleges that he was constructively discharged in violation of an implied employment contract with Defendant. Constructive discharge is a prerequisite to a wrongful termination claim when an employee, such as Plaintiff, resigns. *See Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 472 (4th Cir.2002) (stating that in order to establish wrongful termination, employee must show she was discharged in the first place); *Karch v. BayBank FSB*, 147 N.H. 525, 794 A.2d 763, 774 (2002) (holding that "properly alleging constructive discharge satisfies the termination component of a wrongful discharge claim"); *Pitka v. Interior Reg'l Hous. Auth.*, 54 P.3d 785, 790 (Alaska 2002). Plaintiff's complaint is not as clear as would be preferred, but we will read it broadly to conclude that the allegations regarding constructive discharge are meant to satisfy the termination element of a claim of breach of implied contract to terminate for just cause only. *See Phifer*, 115 N.M. at 138, 848 P.2d at 8 (reiterating that pleadings may be liberally construed and that general allegations are sufficient as long as the parties and the court have a fair idea of the cause of action about which the party is complaining). In order to prevail on a wrongful termination claim, Plaintiff must not only prove constructive discharge but must also independently show the existence and breach of an implied contract to discharge for just cause only. *See Jeanes v. Allied Life Ins. Co.*, 300 F.3d 938, 942 (8th Cir.2002); *Starzynski v. Capital Pub. Radio, Inc.*, 88 Cal.App.4th 33, 105 Cal.Rptr.2d 525, 530 (2001). We proceed with our analysis of constructive discharge because it is determinative of Plaintiff's alleged wrongful termination claim.

{13} We find no New Mexico cases regarding the elements necessary to prove constructive discharge in the context of a claim for breach of an employment contract. Similarly, we find no cases relating to summary judgment on this issue. We therefore look to other jurisdictions.

{14} An employer constructively discharges an employee when the employer makes working conditions so difficult that a reasonable employee would feel compelled to resign. *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 343–44 (10th Cir.1986). In evaluating the work environment, courts have considered such factors as an employer's threats of discharge or suggestions to resign and significant demotions or significant reductions in pay. *James v. Sears, Roebuck and Co.*, 21 F.3d 989, 993 (10th Cir.1994) (finding constructive discharge when older employees were "threatened, pressured and systematically 'written up' over quotas" and told they would be fired or transferred to lower-paying positions if they did not retire); *Brock v. Mut. Reports, Inc.*, 397 A.2d 149, 152 (D.C. 1979) (finding that a corporate vice president was constructively discharged when offered a position that materially reduced his rank); *cf. Gioia v. Pinkerton's, Inc.*, 194 F.Supp.2d 1207, 1228 (D.N.M.2002) (determining no

constructive discharge where employee was not demoted from a supervisory position and his change in duties and pay reduction were not material). Courts have also considered whether employees have been involuntarily transferred and whether they have been subjected to unreasonable criticism of their work. *See Trapkus v. Edstrom's, Inc.,* 140 Ill.App.3d 720, 95 Ill.Dec. 119, 489 N.E.2d 340, 344 (1986) (concluding that employee was constructively discharged when relieved of all managerial responsibilities and ordered to perform menial tasks); *Clowes v. Allegheny Valley Hosp.,* 991 F.2d 1159, 1162 (3d Cir.1993) (cautioning that unreasonably exacting standards of job performance may amount to constructive discharge in conjunction with other aggravating factors). Additionally, courts consider the length of time an employee remains on the job after the onset of allegedly intolerable working conditions. *See, e.g., Yearous v. Niobrara County Mem'l Hosp.,* 128 F.3d 1351, 1357 (10th Cir.1997); *Colores v. Bd. of Trs.,* 105 Cal.App.4th 1293, 130 Cal.Rptr.2d 347, 356 (2003). Some courts also require the employee to give the employer an opportunity to resolve the employee's problem. *See, e.g., Howard v. Burns Bros.,* 149 F.3d 835, 842 (8th Cir.1998) (holding that an employer is not liable for constructive discharge if the employee quits without allowing the employer to resolve the problem); *Woodward v. City of Worland,* 977 F.2d 1392, 1402 (10th Cir.1992).

**{15}** To survive a motion for summary judgment on constructive discharge, an employee must allege facts sufficient to find that an employer has made working conditions so intolerable, when viewed objectively, that a reasonable person would be compelled to resign. *Spulak v. K Mart Corp.,* 894 F.2d 1150, 1154 (10th Cir.1990); *Derr,* 796 F.2d at 343–44. A plaintiff must show that there was no "other choice [for the employee] but to quit." *Yearous,* 128 F.3d at 1356 (internal quotation marks and citations omitted). Neither the employee's subjective view of the working conditions nor the employer's subjective intent on discharge is relevant. *Jeffries v. Kansas,* 147 F.3d 1220, 1233 (10th Cir.1998).

**{16}** Plaintiff bases his constructive discharge claim on three facts: (1) loss of assignment to lighter duties at the Hobbs plant facility, (2) loss of the guaranteed fifty-five hours a week of work, and (3) reduction in pay. We find the evidence in the record concerning these facts insufficient to withstand summary judgment on constructive discharge. Plaintiff did not receive threats of discharge. He was never disciplined; nor did he receive written warnings or reprimands. Plaintiff did suggest that his supervisor, Cardona, continually picked on Plaintiff and pressured him by criticizing him for not properly cleaning the restrooms or offices, but Plaintiff also said that Cardona never told Plaintiff his job was in danger. Plaintiff thought he remembered, but was not sure, that Cardona told him once that he could lose his job if he did not properly perform his required duties. Plaintiff was transferred from a truck route to light duty, but we find no evidence that he opposed the transfer. Nor do we find a material alteration in the light duties assigned to Plaintiff. He was subsequently relieved of certain cashier duties but apparently retained other light warehouse duties. Plaintiff alleges that he was assigned heavy work in the warehouse, which he describes as building loads for trucks. But he also testified that he had help on all his loads from two others in the warehouse, who "took a lot of slack off me because all I'd do is kind of some of the light work that needed to be done." Bolin testified that Cardona asked Plaintiff to run truck routes when someone called in sick or when someone was otherwise needed to run routes.

**{17}** The record indicates that Plaintiff's overtime was ultimately reduced by ten hours. The reduction in pay apparently resulted from the loss of overtime hours; there is no indication that Plaintiff's regular hours or rate of pay were reduced. Indeed, Plaintiff testified that he retired before his overtime hours were cut further. Plaintiff does not suggest that he gave his supervisor an opportunity to resolve Plaintiff's concerns. Instead, Plaintiff decided not to talk to Cardona "[b]ecause I knew anything I said to Ruben, it wouldn't make any difference." Furthermore, Plaintiff remained on the job for more than a year after the initial loss of

overtime hours. Before making a decision to leave, Plaintiff considered the financial impact. He investigated how much social security income he would receive if he retired at his then age of sixty-two, and he decided to take early social security retirement. Plaintiff finally submitted a letter of resignation dated August 21, 1999, to be effective September 17, 1999. Upon receiving the letter, Cardona asked Plaintiff to think over his decision to resign; Plaintiff decided to go ahead with the resignation. Almost a month elapsed between delivery of the letter and Plaintiff's effective date of resignation.

{18} We do not rely on Plaintiff's subjective view of his working conditions. *Id.* Based on these facts and the use of an objective standard, the conditions in Plaintiff's workplace were not such that a reasonable employee would have felt compelled to resign. On the contrary, the facts show that Plaintiff's resignation was planned over a period of time and was tendered only after Plaintiff received information about retirement and social security, thus demonstrating that the resignation was done of his own free will. *See Heno v. Sprint/United Mgmt. Co.,* 208 F.3d 847, 858 (10th Cir.2000) (stating that employee will not be held to have been constructively discharged when resignation is of own free will, even when resignation is the result of employer's actions). Plaintiff chose his date of resignation. *Cf. Yearous,* 128 F.3d at 1356 (noting that employee's selection of effective date of resignation indicates that resignation is not a constructive discharge). Plaintiff provides no evidence to show that he complained about his treatment or did anything to address the allegedly intolerable working conditions. This failure undermines any possibility of finding that Plaintiff had "no other choice but to quit." *Id.* Even considering the evidence in the light most favorable to Plaintiff, an objective view of the facts does not support a conclusion that the work environment was so intolerable that Plaintiff had no other option but to resign. We agree with the district court's grant of summary judgment on constructive discharge.

### 3. Breach of Implied Contract Claim

{19} In his implied contract claim, Plaintiff appears to argue both breach of the terms and conditions of employment prior to his resignation and breach of an implied contract to discharge for just cause only, or wrongful termination. We have already addressed and rejected Plaintiff's constructive discharge argument; therefore, even if an implied contract to discharge for just cause were to exist, any claim Plaintiff may have for breach of that contract by wrongful termination necessarily fails. We now consider the alleged implied contract for minimum hours and light duties. Specifically, Plaintiff argues that Defendant made an implied contract guaranteeing him lighter duties at the warehouse and fifty-five hours per week of work until retirement and that this implied contract was breached when Defendant restricted his overtime hours, reduced his hours, and relieved him of duties. Defendant responds that Bolin's single verbal statement, made six years before Plaintiff retired, did not create an enforceable implied contract. Indeed, Defendant argues that "there is no evidence to demonstrate that the parties intended to alter [the] at-will [employment] relationship" or that they made a contract for Plaintiff to work a certain number of hours until retirement.

{20} New Mexico follows the general rule that employment is terminable at will by either the employee or the employer, absent an express contract to the contrary. *Lopez v. Kline,* 1998–NMCA–016, ¶ 10, 124 N.M. 539, 953 P.2d 304. An exception to the general rule is the existence of an implied contract that limits an employer's authority to discharge. *Id.* ¶ 11. Whether such an implied contract, modifying the at-will employment relationship, exists is generally a fact question. *Hartbarger v. Frank Paxton Co.,* 115 N.M. 665, 669, 857 P.2d 776, 780 (1993). A fact-finder must examine the totality of circumstances surrounding the employment relationship when considering whether an employer made a promise modifying the employment relationship. *Lopez,* 1998–NMCA–016, ¶ 12, 124 N.M. 539, 953 P.2d 304. An implied contract may be found in written or oral representations, in the

conduct of the parties, or in a combination of representations and conduct. *Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 427–28, 773 P.2d 1231, 1234–35 (1989). To support the existence of an implied contract, an oral representation must be sufficiently explicit and definite. *Garrity v. Overland Sheepskin Co. of Taos*, 1996–NMSC–032, ¶ 12, 121 N.M. 710, 917 P.2d 1382. A factual showing of additional consideration or mutual assent to the terms of the implied contract is not required. *Hartbarger*, 115 N.M. at 670–71, 857 P.2d at 781–82.

{21} In this case, Plaintiff and Bolin essentially agree on the conversation giving rise to the alleged implied contract. Bolin admitted he discussed with Plaintiff his remaining on the job at fifty-five hours per week until retirement. Specifically, Bolin testified, "The way I positioned it with Don was we weren't going to cut his pay and as long as he performed his job duties, he wasn't going to get hurt on pay as far as, you know, we was [sic] going to base it off of the 55 hours" and that "we'd leave him in that position until he was ready to retire." But Bolin also testified that he realized anyone's job could change and that Plaintiff could have been fired. Plaintiff, on the other hand, alleges that oral representations by Bolin created a guarantee of hours and duties until retirement, as well as an agreement that he could be terminated only for just cause. In addition to oral representations, the record discloses that after the conversation with Bolin, Plaintiff was transferred to lighter duties in the warehouse and was allowed to work fifty-five hours per week. This continued for more than three years, until 1998, when Southwest merged with Defendant; thereafter, Plaintiff's hours changed, as well as certain of his duties. Reviewing this evidence in the light most favorable to Plaintiff, we conclude that Plaintiff is entitled to have the factual issue of whether an implied contract exists resolved by a fact-finder at a trial on the merits. Consequently, we reverse summary judgment as to breach of implied contract for minimum hours and light duties.

{22} The resolution of this issue depends on the fact-finder's determination regarding Plaintiff's employment status. Was he an at-will employee, or did the statements by Bolin and the totality of circumstances create an implied contract requiring just cause for job termination? This case is particularly odd in that we have already determined there is no basis to find that Plaintiff was terminated; he voluntarily resigned. Therefore, there can be no breach of contract as to wrongful termination. His employment status, however, still has an effect on his claim for breach of contract regarding hours and duties. If the fact-finder determines that Plaintiff's employment was no longer at will, the fact-finder must also decide if the implied contract also precluded changing Plaintiff's hours or duties and, if so, whether the change caused Plaintiff to suffer damages and in what amount. If, however, a fact-finder determines that Plaintiff remained an at-will employee, then any claims regarding breach of contract as to hours and duties would necessarily fail. *See Stieber*, 120 N.M. at 273, 901 P.2d at 204 (holding that an at-will employee accepts modifications in the terms of employment when the employee continues to work subsequent to the modifications). In this case, as in *Stieber*, it is undisputed that Plaintiff knew of the change in work conditions. *See id.* at 272, 901 P.2d at 203. As such, Plaintiff would have accepted the modification by continuing to work. *See id.* at 273, 901 P.2d at 204.

{23} We do not address Plaintiff's promissory estoppel argument, raised for the first time in his reply brief, to support his position on the existence of an implied contract. *See* Rule 12–216(A) NMRA 2003; *State v. Castillo–Sanchez*, 1999–NMCA–085, ¶ 20, 127 N.M. 540, 984 P.2d 787 (stating that the appellate court "will not consider arguments raised for the first time in a reply brief").

## III. CONCLUSION

{24} We reverse the district court's grant of summary judgment on Plaintiff's claim that Defendant breached an implied contract regarding hours and duties, and we remand for further proceedings in accordance with this opinion. We affirm summary judgment on all other claims.

{25} **IT IS SO ORDERED.**

I CONCUR: RODERICK T. KENNEDY, Judge.

IRA ROBINSON, Judge (concurring in part and dissenting in part).

ROBINSON, Judge (concurring in part and dissenting in part).

{26} I concur in the majority's decision to reverse and remand on the Plaintiff's claim that Defendant breached an implied contract regarding hours and duties. I disagree, however, with the majority's holding that the trial court did not err in granting summary judgment in favor of Defendant, as to constructive discharge. There were issues of material fact concerning whether Defendant made Plaintiff's employment intolerable, leading to constructive discharge. I conclude that the trier of fact should have considered these issues rather than disposing of Plaintiff's claims by summary judgment.

{27} After many years of employment, Plaintiff saw his promised duties and employment conditions of the predecessor-owner changed by the new owner, the Defendant, one by one. First, his hours were reduced, which in turn resulted in a cut in pay. Then his duty was made less safe, which in turn made Plaintiff more susceptible to injury. Then his hours were cut even more a second time, and his pay was reduced again. When Plaintiff was 58 years old, the predecessor-owner placed him on "light duty" for safety and health reasons. Under the new owner, however, Plaintiff's "light duty" status was changed to include more strenuous activity; Plaintiff was 62 years old at the time of this change. In addition, despite the fact that Plaintiff was never "written up" for disciplinary action, he testified that his supervisor continually picked on him by criticizing the quality of Plaintiff's cleaning of the restrooms and offices, which were just two of his various duties.

{28} The majority focuses on the fact that Plaintiff remained on the job for more than a year after the initial reduction in hours. Thus, it seems that the majority would penalize Plaintiff for not immediately resigning after the first punitive action taken against him by Defendant. They believe that Plaintiff's waiting almost a year after first having his hours cut and his pay reduced and staying on through a change in job duties that made him less safe and more susceptible to injury, only to have his hours and pay further reduced, works against his constructive discharge claim.

{29} I view this just the opposite. By not resigning immediately after the first punitive action against him, Plaintiff showed great restraint and waited until his employment became unbearable and really intolerable, leaving him, as a reasonable man, no other choice but to resign. The majority seems concerned with the timing of Plaintiff's resignation. It is cruel to say that a worker, now aged 62, must be penalized for checking to see when his Social Security payments would kick in, before taking the final step of resigning, under constructive discharge. I see Plaintiff's actions as that of a reasonable man, not a fool who just gets mad and says "I quit" at the first provocation. Hence, constructive discharge. The trial court erred in granting summary judgment in favor of Defendant as to constructive discharge.

{30} For these reasons, I respectfully concur in part and dissent in part.