**Certiorari Denied, January 3, 2011, No. 32,730**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMCA-057**

**Filing Date: November 4, 2010**

**Docket No. 28,825**

**WENDY CHARLES,**

> **Plaintiff-Appellee,**

**v.**

**THE REGENTS OF NEW MEXICO STATE
UNIVERSITY, f/k/a NEW MEXICO COLLEGE
OF AGRICULTURE AND MECHANIC ARTS,**

> **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY
Robert E. Robles, District Judge**

Mike Milligan
El Paso, TX

for Appellee

Miller Stratvert P.A.
Charlotte Lamont
Albuquerque, NM

for Appellant

## OPINION

**WECHSLER, Judge.**

**{1}** Defendant, New Mexico State University (NMSU), appeals from a jury verdict awarding Plaintiff Wendy Charles $124,653.93 on her claims of retaliation and constructive discharge. On appeal, we address Defendant's arguments that (1) the statute of limitations provided in the New Mexico Human Rights Act (NMHRA), NMSA 1978, §§ 28-1-1 to -14

1

(1969, as amended through 2007), bars acts outside the limitations period from being considered, and (2) there is insufficient evidence, as a matter of law, to support the jury's verdict. We hold that Plaintiff's retaliation claim can be considered under the continuing violation doctrine, allowing facts and evidence prior to the NMHRA statute of limitations cut-off to be considered. We further hold that there is sufficient evidence to support the jury's determination that a constructive discharge occurred. Accordingly, we affirm.

## BACKGROUND

**{2}** Plaintiff began working as a teaching assistant in the Facilities Maintenance Program at NMSU's Doña Ana Branch Community College on January 19, 2001, and she worked there until her resignation on January 31, 2005. Plaintiff was a Technician IV-Lab Tech and assisted instructor James Thompson with his courses. Juan Reyes was also a lab technician and worked part-time assisting Thompson. Thompson was Plaintiff's supervisor from January 2001 until July 2003. Following a university reorganization, in July 2003, Terry Mount became Plaintiff's supervisor. Mount acted as Plaintiff's supervisor until Plaintiff's resignation in January 2005.

**{3}** Plaintiff testified that shortly after she began working at the university, Reyes commented to Plaintiff that he did not like it when Plaintiff held her blouse closed as she bent over to pick something up. Plaintiff testified that she informed Reyes that such statements were inappropriate. Reyes made this statement or similar statements on three separate occasions. The first statement occurred on January 23, 2001, four days after Plaintiff began working for Defendant. The other statements occurred on January 24, and August 8, 2001. Plaintiff testified that, a few days after she first informed Reyes that his comment was inappropriate, Reyes told Plaintiff to "shut-up" and that she did not "know what [she was] talking about" at a meeting in front of both faculty and students. During Plaintiff's employment, Reyes also called Plaintiff names, yelled at Plaintiff, made sarcastic comments about Plaintiff's abilities and the amount of work she did, slammed or hit tables or equipment in Plaintiff's presence, and refused to give Plaintiff receipts or promptly return Plaintiff's credit card when he purchased items using the university credit card issued in Plaintiff's name. Some of these acts occurred in front of students.

**{4}** In March 2001, Plaintiff complained to Thompson about her difficulties in sharing use of the university credit card with Reyes. In August 2001, Plaintiff complained to Thompson again about Reyes's behavior, informing Thompson that Reyes had made inappropriate comments about Plaintiff holding her blouse closed when she bent over. Thompson talked to Reyes on more than one occasion and told Plaintiff that they all needed to "try harder to get along." In February 2003, Plaintiff complained to Thompson in writing about Reyes's behavior, and a personnel meeting was held. The dean attended the meeting and an agreement was reached between Plaintiff and Reyes to treat each other more professionally.

**{5}** Plaintiff contends that, beginning in August 2002, Thompson began retaliating

2

against her by unfairly criticizing her attendance and work performance. According to Plaintiff, Thompson also became more angry, rude, and demeaning toward Plaintiff after the personnel meeting. Thompson began accusing Plaintiff of being late, of not getting the correct supplies, and of not completing her job duties. Thompson also cancelled training Plaintiff had requested and lowered Plaintiff's performance evaluation in the area of "work relations." Plaintiff testified that Thompson yelled at her in front of students and threw a cigarette butt at her. When Plaintiff returned to the dean of the university in September 2003 to complain about this conduct, the dean referred Plaintiff to her new supervisor, Mount. Plaintiff had multiple meetings with Mount regarding her concerns.

{6} In June 2004, Plaintiff filed an informal grievance with NMSU's Equal Employment Opportunity (EEO) office. On September 27, 2004, the EEO office issued a letter stating that it did not find Plaintiff's complaints to amount to discrimination and referred the case to the Assistant Director of Employee Relations for NMSU, Mack Adams. Adams instituted a mediation process that began on October 28, 2004. The mediation concluded, and a mediation agreement circulated in mid-December 2004. The agreement provided Plaintiff with a flexible work schedule; provided Plaintiff training if budgetary constraints allowed; established bi-weekly meetings between Mount, Plaintiff, Thompson, and Reyes; and stated that Plaintiff would bring any inappropriate conduct by Reyes to Thompson's or Mount's attention. Following suggestions by Mount and Thompson, the mediation agreement was amended in early January 2005 to provide for bi-weekly meetings between Plaintiff and Mount, rather than including all parties. The amended mediation agreement also provided that Plaintiff should attempt to resolve any complaints she had that Reyes was not treating her correctly first with Reyes, then with Thompson, and lastly with Mount. The agreement provided, however, that Plaintiff could go directly to Thompson if she did not feel she could discuss her concern with Reyes. On January 14, 2005, Plaintiff submitted her notice of resignation. Plaintiff's last day of employment was January 31, 2005.

{7} Plaintiff filed complaints with the Equal Employment Opportunity Commission (EEOC) and the New Mexico Human Rights Division. In October 2006, Plaintiff filed this civil suit alleging sexual harassment, retaliation, and constructive discharge. Prior to trial, Defendant filed a motion for summary judgment, asserting that the evidence did not support a constructive discharge. After considering the conflicting evidence presented, the district court denied the motion. At the close of Plaintiff's evidence at trial, Defendant made an oral motion for directed verdict, asserting again that the evidence was insufficient to support a constructive discharge, and the district court denied the motion. The jury entered a verdict in favor of Plaintiff on the retaliation claim, but it found in Defendant's favor on the sexual harassment claim. The jury further found that "Plaintiff was constructively discharged from her employment." The jury awarded Plaintiff $94,653.93 in lost wages and $30,000 for emotional distress. After the jury returned its verdict, Defendant filed a motion for judgment notwithstanding the verdict, or in the alternative, a new trial, arguing a third time that the evidence was insufficient to support a constructive discharge. The district court denied this motion as well. Defendant appeals.

**RETALIATION CLAIM**

3

**{8}** The NMHRA provides that it is an unlawful discriminatory practice for any person or employer to "engage in any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice or has filed a complaint, testified or participated in any proceeding under the [NMHRA]." Section 28-1-7(I)(2). In order to establish a claim of retaliation under the NMHRA, a plaintiff must demonstrate that "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between these two events." *Ocana v. Am. Furniture Co.*, 2004-NMSC-018, ¶ 33, 135 N.M. 539, 91 P.3d 58. "An adverse employment action occurs when an employer imposes a tangible, significant, harmful change in the conditions of employment." *Ulibarri v. State of N.M. Corr. Acad.*, 2006-NMSC-009, ¶ 16, 139 N.M. 193, 131 P.3d 43. Plaintiff claims that the adverse employment action she suffered was a constructive discharge.

**{9}** On appeal, Defendant argues that (1) the applicable statute of limitations bars Plaintiff from including in her retaliation claim acts that occurred more than 180 days prior to Plaintiff filing her complaint with the EEOC, and (2) Plaintiff presented insufficient evidence to establish either that she was constructively discharged or that her constructive discharge was causally connected to a protected activity. We address each argument below.

**Statute of Limitations**

**{10}** Defendant contends that Plaintiff filed her complaint with the EEOC on April 12, 2005. Defendant therefore claims that any acts occurring prior to November 2004 should not be considered in support of Plaintiff's retaliation claim. Plaintiff contends that her EEOC complaint was filed when the EEOC received her intake questionnaire, which, according to Plaintiff, was on March 27, 2005. Regardless, Plaintiff substantively advocates that all of the conduct that occurred during her employment be considered pursuant to the continuing violation doctrine. We note that neither party argues that the new 300-day limitation period created by the 2005 amendment to Section 28-1-10 applies. *See Ulibarri*, 2006-NMSC-009, ¶ 8.

**{11}** "[T]he continuing violation doctrine [is] an equitable doctrine permitting a plaintiff to bring an otherwise untimely claim." *Id.* ¶ 9. The continuing violation doctrine distinguishes between "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire[, which] are easy to identify," and hostile environment cases. *Id.* ¶¶ 9-10 (internal quotation marks and citation omitted). The basis for this distinction is that discrete acts generally "constitute separate, actionable unlawful employment practices" and "take place at an identifiable time," *id.* ¶ 9, while hostile environment cases "involve repeated conduct over days or years" and "can be said to have 'occurred' at the time of any act contributing to the hostile environment." *Id.* ¶ 10. Thus, while "a charge covering . . . discrete acts must be filed within the appropriate time period," *id.* ¶ 9, "if one act contributing to a hostile environment claim occurred within the filing period, all acts creating the hostile environment may be considered." *Id.* ¶ 10.

**{12}** Although our Supreme Court adopted the continuing violation doctrine for hostile work environment cases in *Ulibarri*, it did not address whether the doctrine applies to

4

retaliation claims. Nevertheless, like hostile environment cases, cases involving retaliation resulting in constructive discharge may "involve repeated conduct over days or years and individual acts of [retaliation] may not be separately actionable." *Id.*; *see also Gonzales v. New Mexico Dep't of Health*, 2000-NMSC-029, ¶¶ 23, 25, 129 N.M. 586, 11 P.3d 550 (holding that a jury could reasonably conclude that the evidence supported the plaintiff's claim of retaliation based on evidence that the plaintiff was criticized, called a trouble-maker, transferred to a more remote building, not informed of, and denied access to, a posting in which she was interested, and discussing the plaintiff's claim that "the acts of discrimination and retaliation occurred in [a] six-year period"). Therefore, a claim of retaliation resulting in constructive discharge may be based on a series of acts over time. *See, e.g.*, *Littell v. Allstate Ins. Co.*, 2008-NMCA-012, ¶¶ 16-32, 41-44, 51, 143 N.M. 506, 177 P.3d 1080 (affirming a jury verdict for retaliation resulting in constructive discharge based on a series of acts by the supervisor and not on one distinct act). We see no reason to exclude Plaintiff's retaliation claim from the continuing violation doctrine. Consequently, "if one act contributing to a [retaliation] claim [based on a series of actions and not a single, discrete act] occurred within the filing period, all acts creating the [retaliation claim] may be considered." *Ulibarri*, 2006-NMSC-009, ¶ 10.

**{13}** We must therefore consider whether Plaintiff's retaliation claim is based on a discrete act or on a cumulative series of acts. *See id.* ¶ 11. "The NMHRA makes it unlawful for any person or employer to retaliate against any person who has opposed any unlawful discriminatory practice." *Ocana*, 2004-NMSC-018, ¶ 35 (internal quotation marks and citation omitted); Section 28-1-7(I)(2). Retaliation can include threats, reprisals, or discrimination. *See Gonzales*, 2000-NMSC-029, ¶ 19. In this case, Plaintiff asserts that she complained several times, and after each complaint, she experienced retaliation from Reyes, Thompson, and Mount. According to Plaintiff, the retaliation took the form of harassment, threatening behavior discrimination, and reprisals. Plaintiff's claim of retaliation is, therefore, based on a cumulative series of acts, not a "discrete discriminatory act." *Contra Ulibarri*, 2006-NMSC-009, ¶ 11. Consequently, we agree with Plaintiff that all of the conduct that occurred during her employment could have been considered by the jury for her claim, pursuant to the continuing violation doctrine.

**Sufficiency of the Evidence**

**{14}** Defendant argues that Plaintiff presented insufficient evidence to support either a claim of constructive discharge or that there was a causal connection between the constructive discharge and a protected activity. The sufficiency of the evidence is assessed in the context of the jury instructions. *Littell*, 2008-NMCA-012, ¶ 41. To establish her claim for constructive discharge, the jury was instructed that Plaintiff had the burden of proving that "Defendant . . . made [Plaintiff's] working conditions so intolerable, when viewed objectively, that a reasonable person would be compelled to resign; essentially, that she had no other choice but to quit." The instruction correctly sets forth the elements of a constructive discharge under New Mexico law. *Gormley v. Coca-Cola Enters. (Gormley II)*, 2005-NMSC-003, ¶ 10, 137 N.M. 192, 109 P.3d 280 (stating that a claim for constructive discharge requires an employee to show "that the employer made working conditions so intolerable, when viewed objectively, that a reasonable person would be compelled to

5

resign"); *see also Littell*, 2008-NMCA-012, ¶ 41 (providing the jury with a constructive discharge elements instruction stating that, in order to consider the plaintiff constructively discharged, the jury must "find that [the d]efendant . . . made her working conditions so intolerable, when viewed objectively, that a reasonable person would be compelled to resign, and she had no other choice but to quit"). Our Supreme Court has noted that "[t]he bar is quite high for proving constructive discharge." *Gormley II*, 2005-NMSC-003, ¶ 10 (internal quotation marks and citation omitted).

**{15}** Our standard of review in assessing whether the verdict of the jury is supported by the evidence is well settled:

> In reviewing a sufficiency of the evidence claim, this Court views the evidence in a light most favorable to the prevailing party and disregard[s] any inferences and evidence to the contrary. We defer to the jury's determination regarding the credibility of witnesses and the reconciliation of inconsistent or contradictory evidence. We simply review the evidence to determine whether there is evidence that a reasonable mind would find adequate to support a conclusion.

*Littell*, 2008-NMCA-012, ¶ 13 (alteration in original) (internal quotation marks and citations omitted). Our courts have looked to federal decisions for guidance to determine the elements of a constructive discharge under New Mexico law. *See Gormley II*, 2005-NMSC-003, ¶ 10. However, we have not adopted, wholesale, federal decisions, particularly when assessing whether the evidence is sufficient to prove a constructive discharge. *Littell*, 2008-NMCA-012, ¶ 13 ("We reject [Defendant's] contention that the 'clearly erroneous' standard of review, which is employed by the federal courts, applies in this state court action."). Our standard of review does not change because we are tasked with assessing the sufficiency of the evidence for a constructive discharge. That is, we view the evidence as described in *Littell* to determine if the essential elements of a constructive discharge, as set forth in the elements instruction, were proven.

**{16}** In determining whether a plaintiff has satisfied this burden, "[t]he specific facts of the employment condition, and the severity of its impact upon the employee, are pivotal." *Id.* ¶ 12. "In many cases, the circumstances surrounding resignation are not egregious enough to support a claim." *Id.* Our appellate courts have declined to establish bright-line rules for determining whether a constructive discharge exists and have instead chosen to consider a number of factors in assessing the specific circumstances of each case. *See id.* ¶ 21; *Littell*, 2008-NMCA-012, ¶ 48. Some of the factors that our appellate courts have identified in constructive discharge cases include whether an employer has threatened termination, suggested that the employee resign or retire, demoted the employee, or reduced the employee's pay, *see Gormley II*, 2005-NMSC-003, ¶¶ 11, 16; whether the employee has been subjected to unreasonable criticism or discipline, *id.*; *see Littell*, 2008-NMCA-012, ¶ 42; whether an employee remained on the job after the onset of the intolerable working conditions and for what length of time, *see Ulibarri*, 2006-NMSC-009, ¶ 14; *Gormley II*, 2005-NMSC-003, ¶¶ 19-20; whether an employee gave notice prior to quitting, *Gormley II*, 2005-NMSC-003, ¶¶ 20-21; whether the employee was subjected to conduct such as

6

aggressive, physically intimidating behavior or public humiliation, *see Littell*, 2008-NMCA-012, ¶ 42; and whether an employer had an opportunity to or attempted to resolve the problem, *Gormley I*, 2004-NMCA-021, ¶¶ 14, 17; *see Littell*, 2008-NMCA-012, ¶ 43.

{17}    In line with *Gormley II*, the question for the jury under the elements instruction in this case was not whether the working conditions were merely difficult or unpleasant, but whether Defendant made Plaintiff's working conditions "so intolerable, when viewed objectively, that a reasonable person would be compelled to resign; essentially, that she had no other choice but to quit." *See* 2005-NMSC-003, ¶ 10.  The jury also received an instruction that Defendant denied Plaintiff's retaliation claim and contended that "she was not subjected to any objectively materially adverse employment action and that the alleged acts of retaliation were normal supervisory acts done in the regular course of business." In addition, the jury received an instruction that Defendant also denied that Plaintiff was constructively discharged and asserted that "the acts complained of were average supervisory conduct, and that Plaintiff . . . voluntarily resigned." In accordance with UJI 13-304 NMRA, the Jury was instructed that, in evaluating the competing claims of Plaintiff and Defendant,

> A party seeking recovery or a party relying upon a defense has the burden of proving every essential element of the claim or defense by the greater weight of the evidence.

> To prove by a greater weight of the evidence means to establish that something is more likely true than not true.  When I say in these instructions that the party has the burden of proof on sexual and retaliatory harassment and constructive discharge, I mean that you must be persuaded that what is sought to be proved is more probably true than not true.  Evenly balanced evidence is not sufficient.

The jury received accurate, complete instructions on the applicable law and its duties in evaluating the evidence and contentions of the parties.

{18}    Plaintiff presented testimony that, during her four years of employment with Defendant, her co-worker Reyes yelled at her; told her to "shut-up"; said she did not do anything; and called her "telele" (Spanish for "dummy"), "Miss know-it-all," and, on one occasion, a "stupid bitch."  Plaintiff also testified that, on at least one occasion, Reyes subjected her to aggressive and intimidating conduct by yelling at her while standing with his face only inches from her own, and on another occasion told Plaintiff that if she held her blouse closed while bending over he would "kick [her] right up the ass."  Some of this conduct occurred in front of students. Plaintiff also presented evidence that Reyes slammed drawers and cabinets, refused to give her receipts for purchases he had made using a university credit card that was issued in Plaintiff's name, and laughed at Plaintiff and made fun of her.  Similarly, Plaintiff presented evidence that her supervisor, Thompson, yelled at Plaintiff and criticized her in front of students, and on one occasion, picked up a cigarette butt off the floor and threw it at Plaintiff's chest accusing Plaintiff of having left it on the floor.

**{19}** Plaintiff also claims she was subjected to unfair criticism of her work performance. Plaintiff presented evidence that Thompson accused her of being late and of not following the class syllabus, complained that student grades were missing, complained that the program website contained misspelled words and had not been updated, and complained that Plaintiff had not completed other job duties, such as inventory, in a timely fashion. Further, Plaintiff presented evidence that Thompson came into her office and threw folders on the floor looking for something he had misplaced in his own office, began changing his mind about due dates for projects and about supplies he had requested Plaintiff to purchase, and had decreased Plaintiff's performance rating on her evaluation under "working relations."

**{20}** The jury concluded, based on the evidence, that Plaintiff was constructively discharged. The jury apparently concluded that Plaintiff's evidence was more credible than Defendant's, and our task is not to second guess its factual findings. *Littell*, 2008-NMCA-012, ¶¶ 38, 45, 48 (stating that we review for substantial evidence to support the result reached, that the trier of fact resolves conflicts in testimony, and that we do not reweigh evidence or substitute our judgment for that of the jury). In *Littell*, we rejected the defendant's sufficiency of the evidence argument that in effect asked us to reweigh the evidence. *Id.* ¶ 48. We stated that "[i]t is not our role to reweigh the evidence or substitute our judgment for that of the jury." *Id.* We therefore concluded that "the evidence, when considered in its totality, could have reasonably supported the jury's conclusion that [the d]efendant made [the p]laintiff's working conditions so intolerable that a reasonable person in her position would have been compelled to resign." *Id.* As in *Littell*, the evidence set forth by Plaintiff is sufficient to sustain the jury verdict.

**{21}** We note that Defendant attempts to distinguish this case from *Littell*. We are not persuaded. In *Littell*, this Court held that a constructive discharge existed when, among other factors, the plaintiff had been subjected to criticism that was "inaccurate and outrageous" in that the plaintiff testified the criticism was without any factual basis, and the plaintiff had presented testimony from other people that she worked with closely that she was a competent employee who did excellent work. *Id.* ¶ 42. In contrast to *Littell*, Defendant argues that Plaintiff was never formally disciplined, that her work space was not altered, and that she was not denied a leave of absence. Defendant further argues that Plaintiff did not offer testimony from people who could attest to "unusual interactions between [Plaintiff] and Thompson"; she was not subjected to any formal discipline; and she was not ever threatened with termination, demoted, asked to resign, or subjected to a reduction in pay. Defendant additionally points out that Plaintiff remained on the job after the onset of allegedly intolerable working conditions for quite some time, Plaintiff explored her options prior to leaving, and Plaintiff gave notice prior to her resignation.

**{22}** However, we do not review evidence to determine if it supports an opposite result, but we determine whether the evidence is sufficient to support the result reached. *Id.* ¶ 38. As discussed above, the evidence presented to the jury was sufficient to support the jury's findings. Although Defendant attempts to resolve the issues raised by Plaintiff by undercutting Plaintiff's argument that a reasonable person would have felt she had no other choice but to quit at the time Plaintiff submitted her resignation, we do not reweigh evidence or "substitute our judgment for that of the jury." *Id.* ¶ 48.

**{23}** Defendant additionally makes similar arguments, pursuant to *Gormley I*, that (1) Plaintiff had been looking for another job during the last months of her employment and intended to quit once she had secured one, *see* 2004-NMCA-021, ¶ 17 (relying, in part, on the fact that the plaintiff waited over a year after a reduction in pay during which he investigated his social security benefits and decided to take early retirement prior to resigning and concluding that the plaintiff was not constructively discharged); and (2) Plaintiff tolerated the conduct she complains of for a significant period of time. However, our Supreme Court declined to stipulate "a time within which an employee must leave to complain of constructive discharge." *Gormley II*, 2005-NMSC-003, ¶ 21 (further stating that "the circumstances surrounding how long the employee remains on the job and continues to suffer from onerous conditions" is only one factor that we must consider in looking at the specific circumstances of a case to determine if a constructive discharge occurred). Moreover, a plaintiff remaining in a position and tolerating inappropriate behavior for a significant period of time is not fatal to a constructive discharge. *See Littell*, 2008-NMCA-012, ¶¶ 17, 24, 30, 42 (upholding the jury's determination that a constructive discharge had occurred when the plaintiff tolerated sexually harassing behavior for more than three years and physical intimidation, pretextual discipline, and sabotage by her supervisor for at least a year).

**CONCLUSION**

**{24}** For the foregoing reasons, we affirm.

**{25}   IT IS SO ORDERED.**

_____

**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____

**CELIA FOY CASTILLO, Judge**

_____

**MICHAEL E. VIGIL, Judge**

**Topic Index for *Charles v. NMSU Regents*, Docket No. 28,825**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SB | Substantial or Sufficient Evidence |
| AE-SR | Standard of Review |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-JV | Jury Verdict |
| CP-SL | Statute of Limitations |

**CR**                 **CIVIL RIGHTS**
CR-ED            Employment Discrimination
CR-HA            Human Rights Act
CR-SX            Sex Discrimination

**EL**                 **EMPLOYMENT LAW**
EL-DS            Discrimination
EL-RT            Retaliatory Discharge
EL-TE            Termination of Employment